**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VILOX AB<br><br>Plaintiff,<br><br>v.<br><br>MOHAWK INDUSTRIES, INC., MENARD, INC., and UNILIN BV<br><br>Defendants. | ) | C.A. No. 24-1430-JCB<br><br>JURY TRIAL DEMANDED |
| MOHAWK INDUSTRIES, INC., MOHAWK CARPET DISTRIBUTION, LLC, IVC US, LLC, and UNILIN BV,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>VILOX AB<br><br>Counterclaim-Defendant. | ) | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INDEFINITENESS**

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ....................6

II. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT ....................6

III. BACKGROUND ....................7

A. Procedural History ....................7

B. Overview of the '717 Patent ....................8

IV. LEGAL STANDARD ....................9

V. ARGUMENT ....................10

A. "lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling tongue" / "wherein the lower recess is defined by an inclined surface extending a distance from a distal surface of the female coupling tongue to between 60% to 90% of the length of the female coupling tongue" / "a horizontal distance from a distal surface of the female coupling tongue and a distal surface of the main portion of the second floor panel is between 5% and 15% of the length of the female coupling member" (Claims 1, 4, 15, 16, 20) ....................10

1. "distal surface of the female coupling tongue" ....................10

2. "distal surface of the main portion of the second floor panel" ....................14

B. "coupling release channel" / "such that the coupling release tool is placeable in the coupling release channel" (Claims 1, 16, 18, 19, 20). ....................16

C. "[for engaging]/[can engage] the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means" (Claims 1, 16, 18, 19, 20). ....................23

VI. CONCLUSION ....................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Akamai Techs., Inc. v. MediaPointe, Inc.*,
159 F.4th 1370 (Fed. Cir. 2025) ....................10, 26

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................10

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
No. 2:15-cv-1047-RSP, 2016 U.S. Dist. LEXIS 105750 (E.D. Tex. August 10, 2016)..........17

*Automated Packaging Sys. v. Free Flow Packaging Int'l, Inc.*,
No. 18-cv-00356, 2018 U.S. Dist. LEXIS 130122 (C.D. Cal. Aug. 2, 2018) ....................23, 24

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
803 F.3d 620 (Fed. Cir. 2015)....................17

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l*,
222 F.3d 951 (Fed. Cir. 2000)....................23

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)....................10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)....................10, 20

*Saso Golf, Inc. v. Nike, Inc.*,
843 F. App'x 291 (Fed. Cir. 2021) ....................11, 17, 18

*SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*,
No. 1:22-cv-00266, 2025 U.S. Dist. LEXIS 151928 (D. Del. Aug. 7, 2025)....................23

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)....................15

*Toshiba Corp., v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012)....................10

**RULES**

Fed. R. Civ. P. 56....................10

**STATUTES**

35 U.S.C. § 112....................8, 10

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| **A** | U.S. Patent No. 12,180,717 |
| **B** | Excerpted File History of U.S. Patent No. 12,180,717 |
| **C** | Vilox Infringement Contentions (Feb. 13, 2026) |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| Vilox | Plaintiff Vilox AB |
| Mohawk | Defendant and Counterclaim-Plaintiff Mohawk Industries, Inc. |
| Unilin | Defendant and Counterclaim-Plaintiff Unilin BV |
| Menards | Defendant Menard, Inc. |
| Defendants and Counterclaim-Plaintiffs | Mohawk, Unilin, and Menards together with Counterclaim-Plaintiffs Mohawk Carpet Distribution, LLC and IVC US, LLC |
| ’717 Patent | U.S. Patent No. 12,180,717 (Ex. A) |

## I. INTRODUCTION

The claims of the single patent asserted by Vilox in this action fail to provide objective boundaries. The ’717 Patent purports to claim a joining system for floor panels. But these seemingly straightforward claims are anything but that. The claims instead recite a convoluted system of structures and functions that, even when read in light of the intrinsic evidence, fail to inform those skilled in the art about the scope of the claimed invention with reasonable certainty. This uncertainty has real-world implications. It allows the patentee to bend and mold the meaning of the claims to fit its infringement or validity narrative, all while hiding from the public what is, and is not, covered by the patent. Such issues are readily apparent here, where Vilox alleges infringement by inconsistently picking and choosing structure in the accused products, like surfaces and channels, to allegedly meet the asserted patent. Because this indefiniteness infects each claim of the ’717 Patent, summary judgment should be granted and the patent found invalid.

## II. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1. Whether the terms “lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling tongue”; “wherein the lower recess is defined by an inclined surface extending a distance from a distal surface of the female coupling tongue to between 60% to 90% of the length of the female coupling tongue”; and “a horizontal distance from a distal surface of the female coupling tongue and a distal surface of the main portion of the second floor panel is between 5% and 15% of the length of the female coupling member” render claims 1, 4, 15, 16, and 20 indefinite where the location of the points of measurement cannot be ascertained by a POSITA with reasonable certainty.
2. Whether the terms “coupling release channel” / “such that the coupling release tool is placeable in the coupling release channel” render claims 1, 16, 18, 19, and 20 indefinite as

the intrinsic record fails to offer objective boundaries as to the size and nature of the coupling release channel or the type of coupling release tool.

3. Whether the term "[for engaging]/[can engage] the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means" renders claims 1, 16, 18, 19, and 20 indefinite as the claims and the intrinsic record fail to inform a POSITA with reasonable certainty as to how the horizontal locking or the vertical locking means are "released" within the scope of the invention.

## III. BACKGROUND

### A. Procedural History

Vilox filed its complaint for patent infringement by Mohawk of the '717 Patent. *See* D.I. 1. Vilox first amended its complaint to add Menards as a defendant, also accusing Menards of infringing the '717 Patent. *See* D.I. 11. The Court later granted leave to Vilox to file a second-amended complaint to add Unilin as a defendant and to add claims directed to alleged false statements and tortious interference by Unilin and Mohawk under the Lanham Act and Delaware state law . *See* D.I. 67. The parties exchanged proposed claim terms for construction on March 30, 2026. *See* D.I. 65 and D.I. 66. The parties then exchanged preliminary claim constructions. *See* D.I. 71 and D.I. 72. After meeting and conferring and coming to agreement on a number of terms, the parties submitted the Joint Claim Construction Chart. D.I. 85. Defendants identified three terms as indefinite under 35 U.S.C. § 112(b). *See* D.I. 85. Vilox asserts each of these terms is entitled to its plain and ordinary meaning and that each of the terms is not indefinite. *See id.* Each term is listed below:

- "lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling

tongue" / "wherein the lower recess is defined by an inclined surface extending a distance from a distal surface of the female coupling tongue to between 60% to 90% of the length of the female coupling tongue" / "a horizontal distance from a distal surface of the female coupling tongue and a distal surface of the main portion of the second floor panel is between 5% and 15% of the length of the female coupling member" (Claims 1, 4, 15, 16, 20). These terms are referred to herein as the "Measurement Terms."

- "coupling release channel" / "such that the coupling release tool is placeable in the coupling release channel" (Claims 1, 16, 18, 19, 20). These terms are referred to herein as the "Coupling Release Channel Terms."
- "[for engaging]/[can engage] the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means" (Claims 1, 16, 18, 19, 20). These terms are referred to herein as the "Locking Release Terms."

**B. Overview of the '717 Patent**

The '717 Patent is directed to "a joining system for floor panels, comprising a female coupling recess formed in a first floor panel." '717 Patent at 1:17-19. "The female coupling recess is shaped for receiving a male coupling tongue projecting from an adjoining second floor panel in a direction away from a main floor surface plane in which the floor panels are laid." *Id.* at 1:18-22. The '717 Patent provides that in the prior art, "fold-down joining systems" had "elasticity slots" which could "cause a structural weakness in the joint which in some embodiment [sic] may be undesired." *See id.* at 8:44-52. The '717 Patent goes on to describe that "it is beneficial to be able to release the joint in case of if a panel is damaged or incorrectly placed." *Id.* at 8:51-52. Thus,

the object of the '717 Patent is "to provide a system for joining floor panels which allows a secure and easy joining of floor panels, which provides an improvement of structural rigidity of the joint and which is releasable." *Id.* at 8:53-56. The details of the alleged invention of the '717 Patent are described further below.

## IV. LEGAL STANDARD

"Summary judgment is appropriate when, drawing all justifiable inferences in the non-movant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Toshiba Corp., v. Imation Corp.*, 681 F.3d 1358, 1361 (Fed. Cir. 2012); Fed. R. Civ. P. 56. A dispute is "genuine" only where there is sufficient evidence for a reasonable factfinder to find in favor of the non-moving party, and it is "material" only when it could affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "[I]ndefiniteness is a question of law" and appropriate to resolve on summary judgement. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1380 (Fed. Cir. 2005).

A claim term is indefinite under 35 U.S.C. § 112 when, viewed in light of the claim, the specification, and the prosecution history, it fails to inform those skilled in the art about the scope of the claimed invention with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Additionally, "[a] claim term, even if it refers to certain objective measures, is indefinite if it might mean several different things but no informed and confident choice is available among the contending definitions." *Akamai Techs., Inc. v. MediaPointe, Inc.*, 159 F.4th 1370, 1378 (Fed. Cir. 2025) (citation modified). Thus, a claim "is indefinite unless, when read in light of the specification and the prosecution history, it provides objective boundaries for those of skill in the art." *Id.* (citation modified); *see also Nautilus, Inc.*, 572 U.S. at 899 ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what

is still open to them.") (citation modified).

## V. ARGUMENT

### A. "lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling tongue" / "wherein the lower recess is defined by an inclined surface extending a distance from a distal surface of the female coupling tongue to between 60% to 90% of the length of the female coupling tongue" / "a horizontal distance from a distal surface of the female coupling tongue and a distal surface of the main portion of the second floor panel is between 5% and 15% of the length of the female coupling member" (Claims 1, 4, 15, 16, 20).

In a patent that requires a measurement: "for an artisan to be reasonably certain whether a [accused product] falls within the scope of the patent, they must be reasonably certain of the measurement points." *Saso Golf, Inc. v. Nike, Inc.*, 843 F. App'x 291, 296 (Fed. Cir. 2021). Where "it is not clear from where on each surface one measures," the claims are indefinite. *Id*.

Here, these phrases are indefinite because each requires specific measurements from unspecific "distal surfaces." Both a "distal surface of the female coupling tongue" and a "distal surface of the main portion of the second floor panel" are recited in these claim terms. The terms then claim specific distance ranges measured from these distal surfaces. But, critically, the locations of the distal surfaces are not reasonably certain. This ambiguity allows the patentee to pick and choose distal surfaces that suit them—leaving the public to guess where the patent boundaries lie. *See id*.

#### 1. "distal surface of the female coupling tongue"

Each of these three claim terms recite an indefinite "distal surface of the female coupling tongue." Both (1) the patent and (2) Vilox's infringement contentions demonstrate the lack of definitive boundaries for this claim limitation.

*First*, the patent itself uses the term in an inconsistent manner. For example, throughout the patent the "distal surface of the female tongue" is described as reference numeral 44. *See*

*e.g.*, ’717 Patent at 12:23-24, 12:29, 12:42, 12:53, 12:57. The figures consistently point to the rounded top edge of the female coupling tongue as the “distal surface 44”—highlighted in Figures 1A and 2 below.

Fig.1A



Fig.2



In contrast, the patent also describes “a distance D from the distal surface 44” which is measured from a different distal surface. Specifically, distance D is measured from the vertical surface that makes up the farthest edge of the female coupling tongue—as highlighted in Fig. 1B below. *See* ’717 Patent at 12:51-57.

Fig.1B



*Second*, Vilox’s infringement contentions also use the term inconsistently. For example, Vilox measures the accused products from the farthest edge of the female coupling tongue (same

as measurement D in the patent) and not from the rounded top edge that the patent labels as "distal surface 44."




Ex. C (Vilox's Infringement Contentions) at 26.

These inconsistencies are not inconsequential. In fact, the real-world need for certainty in where the claimed "distal surface" lies is illustrated by Vilox's infringement contentions. The claims require that "the lower recess is defined by an inclined surface extending a distance from a distal surface of the female coupling tongue to between 60% to 90% of the length of the female coupling tongue." In its infringement contentions, Vilox alleges that the "lower recess makes up 61% of the length of the female coupling tongue" based on a measurement taken at the farthest edge of the female coupling tongue.[1] Ex. C (Vilox's Infringement Contentions) at 25, 26. But if measured from where the patent labels the "distal surface 44"—i.e., the rounded top edge of the

[1] Vilox, in its infringement contentions, also appear to measure the "lower recess length" across two inclined surfaces. The claims requires "the lower recess is defined by ***an*** inclined surface" and the patent consistently shows a single inclined surface defining the lower recess. '717 Patent at Figs, 1A-6, 12, 14, 17-21. To the extent Vilox argues that "defined by an inclined surface" includes defined by two or more inclined surfaces, that further adds to the indefiniteness of these terms.

female coupling tongue—then the accused product would not meet this claim limitation. Below are Vilox's measurements from its infringement contentions annotated with a measurement from where the patent labels "distal surface 44."[2]




Ex. C (Infringement Contentions) at 26 (annotated). Vilox's measurements purport to show the lower recess length as 19 units and the female coupling tongue length as 31 units (i.e., 19/31 or 61%). Whereas the measurement from where the patent labels "distal surface 44" shows the lower recess length as 17 units, or 55% of the length of the female coupling tongue. A measurement that falls outside the claimed "60% to 90%" range.

Further, these claims are critical to the patent. During prosecution, the patentee argued that the claimed 60% to 90% measurements from the distal surface was critical to the invention. For example, during an Examiner interview, the patentee stated that this claim limitation "is critical to the operation of the claimed invention." Ex. B ('717 Patent File History) at VILOX001133. The

[2] The accused product includes a straight portion extending from the farthest edge of the female coupling tongue to the rounded top edge of the female coupling tongue. The measurement is taken from where the rounded top edge begins.

Examiner then relied on this representation as providing a basis for allowance over the prior art. Ex. B ('717 Patent File History) at VILOX001168. Because this claim term provides an alleged point of novelty, it is critical that it can be understood with reasonable certainty. Here, it cannot be because there are two reasonable interpretations supported by the specification that materially impact the scope of the claims. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015) (holding term indefinite where a measurement could have several different meanings, but the intrinsic evidence did "not convey with reasonable certainty the [measurement] to be used").

**2. "distal surface of the main portion of the second floor panel"**

The patent also recites "a distal surface of the main portion of the second floor panel" which injects further indefiniteness into the claims. The patent labels this distal surface as reference numeral 43 and points to the furthest vertical edge of the main portion 220. *See e.g.*, '717 Patent at 12:24, 12:30, Fig. 1A-4, Fig. 12, Fig. 14.




Vilox, meanwhile, points to an intermediate surface on the main portion as the claimed "distal surface."




Ex. C (Infringement Contentions) at 40.

This term once again allows the patentee to pick whichever "distal surface" meets the specific distance requirement of the claim term. As shown in the annotated figure below, if Vilox pointed to the farthest vertical edge of the main portion instead—as is labeled in the patent—the measurement of the accused product would not have a horizontal distance between distal surfaces within the claimed 5% to 15% range. In fact, there would be no horizontal distance between the purported distal surface of the female coupling tongue and the distal surface of the second floor panel because the distal surface of the second floor panel is disposed past the purported distal surface of the female coupling tongue.




Ex. C (Infringement contentions) at 40 (annotated).

The indefiniteness of these terms prevents the public from understanding what is, and is not, claimed by the patent. Instead, it allows the patentee to pick and choose where it wants the "distal surface" to be to fit an infringement narrative. For that reason, these terms are invalid as indefinite. *See Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 635 (Fed. Cir. 2015) ("a claim term is indefinite if it leaves the skilled artisan to consult the unpredictable vagaries of any one person's opinion") (citation modified); *see also Saso Golf*, 843 F. App'x at 296 (holding claims requiring a radius of curvature measurement indefinite where "it is not clear from where on each surface one measures to the most rearwardly point to determine the radii of curvature"); *Arthrex, Inc. v. Smith & Nephew, Inc.*, No. 2:15-cv-1047-RSP, 2016 U.S. Dist. LEXIS 105750, at *42-43 (E.D. Tex. August 10, 2016) (finding the term "most distal end of the implant" indefinite since the specification failed to provide objective boundaries to know where the most distal end was located).

**B. "coupling release channel" / "such that the coupling release tool is placeable in the coupling release channel" (Claims 1, 16, 18, 19, 20).**

The Coupling Release Channel Terms are indefinite for three distinct reasons. First, the coupling release channel is a gap defined by a spatial relationship between two panels, but the intrinsic record offers no objective guidance as to the size of the coupling release channel needed to effectuate release. Second, the claims require the coupling release tool be placeable in the coupling release channel, but the intrinsic record provides no objective boundaries to the size and shape of the coupling release tool. Third, claim 16 is indefinite as it claims only ***one*** panel, and the intrinsic record offers no guidance on how to form a coupling release channel with one panel. Claims 18-19 are similarly indefinite as they depend from claim 16.

*First,* the intrinsic record fails to inform a POSITA as to the size of the coupling release channel. Claims 1 and 20 recite similar language as to the coupling release channel and coupling

release tool: "a coupling release channel being arranged between the locking protrusion and an upper surface in the groove in the second floor panel, such that the coupling release tool is placeable in the coupling release channel…" (Claim 1) and "a coupling release channel being arranged between the locking protrusion ***of the first floor panel*** and an upper surface in the groove in the second floor panel, such that the coupling release tool is placeable in the coupling release channel…" (Claim 20). *See* '717 patent at cls. 1, 20 (emphasis added to highlight difference in claim language). The specification provides that:

> the joining system further comprises a coupling release channel 41 being part of the male and female coupling for receiving a coupling release rod 110, when the male coupling is locked in the female coupling (which is the state shown in FIG. 3). The coupling release channel 41 can thus be defined between the locking protrusion 31 and an upper surface 71 in the groove 70 of the first and second floor panels 10, 20 respectively. A distance M between the upper surface 71 of the groove 70 and the top surface 42 of the locking protrusion 31 when the first and second panels 10, 20 are joined together may be between 10% to 40% of the thickness Q of the first and second panel 10, 20. In one embodiment, between 15% to 25% of the thickness Q.

*See, e.g.,* '717 Patent at 11:5-18. Thus, the specification describes that the coupling release channel may be defined between the locking protrusion of the first floor panel and the upper surface in the groove of the second floor panel. *See id.* And goes on to describe that the distance M between the top surface of the locking protrusion and the groove ***may*** be between 10% and 40% or between 15% to 25% of the thickness Q of the first and second panel. *Id.* (emphasis added). However, these embodiments are not claimed and are described as optional (e.g., "may be between 10% and 40%" and "In one embodiment, between 15% to 25%"). As shown elsewhere in the claims, when the patentee wanted to claim a specific measurement, they did just that (e.g., "a distance, from a distal surface thereof to between 60% to 90%" and "a protrusion length . . . of between 10% to 40% of a thickness of the second floor panel"). Here, the claims offer no similar specific measurements relating to the size of the channel. The only guidance provided by the claims for the size of the

"release channel" is that it is arranged "such that the coupling release tool is placeable in the coupling release channel." But, as discussed below, this provides no objective boundaries because the term "coupling release tool" is likewise indefinite and the specification places no clear boundaries on the space required for the release tool to be "placeable."

The intrinsic record also fails to inform a POSITA as to the state the first and second panels must be in for the coupling release channel to exist (e.g., fully locked and/or partially locked). While the specification describes the coupling release channel as existing in the "locked" position (*see* '717 Patent at 11:5-18) it is notated in the figures in all ranges of conditions, including unlocked and completely separated. *See* Figs. 2-4, 21 (exemplary figures annotated below).




'717 Patent at Figs. 2, 3, 4, and 21.

Vilox's infringement contentions provide an example of the indefinite nature of this claim

term. Vilox alleges that the below is a "coupling release channel."




Ex. C (Infringement Contentions) at 21. But Vilox provides no evidence that a "coupling release tool is placeable in" this purported coupling release channel. It is simply the space that inevitably exists when two floor panels are joined together. This highlights the indefiniteness issue with these terms—they allow the patentee unbounded ability to point to any opening, of any size, that exists in any state of the panels, as the claimed "coupling release channel."

This lack of objective guidance as to the size of the coupling release channel, and the state of the first and second panels required for the channel to exist, renders this term indefinite. The coupling release channel is not a structural element itself, but rather, it is a an undefined gap between the two panels. It therefore relies on other structures to provide objective boundaries. Here, such boundaries are missing. Without any "objective guidance" as to the size and nature of this space, a POSITA cannot discern the scope of the invention with reasonable certainty. *See Nautilus*, 572 U.S. at 910.

*Second,* the intrinsic record also does not offer objective boundaries as to the scope of the "release tool." This claim term is relevant to the size of the coupling release channel, as the claims, as well as the specification, describe that the coupling release channel should be arranged "such that the coupling release tool is placeable in the coupling release channel." *See* '717 patent at cls.

1, 20; *see also* ’717 Patent at 2:47-54; 5:7-12; 5:47-54; 6:6-13; 6:35-42. But the specification does not provide any guidance on the size or shape of the claimed “coupling release tool.” For example, the specification simply describes that “[t]he joining system can thus be released both by means of the coupling release tool, by pivoting and/or by means of sliding the first and second panel in the longitudinal direction in relation to one another.” *Id.* at 4:34-37; *see also id.* at 19:6-10; 22:17-21. While the specification provides more detailed descriptions and examples of a “coupling release rod”—the claims place no objective boundaries on its size or shape.

It is not clear whether the claimed “coupling release tool” and the “coupling release rod” discussed in the specification are coextensive—further creating an indefiniteness issue. The specification on two occasions refers to the coupling release tool as feature number 110, the same feature number as coupling release rod. *See, e.g.,* ’717 Patent 19:6-10 (“The first and second panel 10, 20 may further be released by means of the coupling release tool 110 and/or by means sliding the two panels 10, 20 in the longitudinal direction in relation to one another.”). But in contrast, the prosecution history indicates that these two terms are treated differently. *See* Ex. B (’717 Patent File History) at VILOX000870-871 (examiner finding the pending claim 11 indefinite in part because it was “unclear if the ‘coupling recess rod is referring to the previously introduced ‘coupling release tool.’”); VILOX000883 (acquiescing to rod being indefinite, applicant in amendment provided: “regarding claim 11, Applicant has replaced ‘rod’ with ‘tool,’ as noted by the Examiner.”). Regardless, to the extent that applicant intended coupling release rod and coupling release tool to be coextensive, the intrinsic record is also indefinite as to the actual size of a “coupling release rod.”

Specifically, as to coupling release rod, the patent fails to disclose objective boundaries as to its size. The specification provides that Figures 7-13 illustrate embodiments of the “coupling

release rod." *See* '717 Patent at 7:60-8:8. (exemplary figures shown below). As one example, the specification describes that "[t]he coupling release rod 110 comprises an introductory section 180 with a constant cross-sectional area, extending from a tip portion 120 to a tapered unlocking section 190 with increasing cross-sectional area towards the base portion 130 of said coupling release rod 110." '717 Patent at 14:53-58 (describing Figure 7). The specification gives some relative dimensions to the coupling release rod. *See id.* at 14:58-15:5. For example, it describes that "[t]he length Lt of the tapered unlocking section 190 may exceed the length Li of the introductory section 180 . . ., [and] The length Li of the introductory section may be from 30% to 50% of the length Lt of the tapered unlocking section 190 in some examples." *See id.* at 14:59-67. However, while the patent offers some description as to the relative size of the features in a "release rod" and some exemplary release rods through figures, it fails to describe with reasonable certainty the actual size of those rods or how much space is needed in the "coupling release channel" for the rod (or tool) to function. Particularly, the specification is silent as to the size of the part that is "placeable in the coupling release channel" that would define the size of such a channel. *See e.g.,* '717 Patent at 14:58-15:5; 15:50-16:3; 16:4-17. Thus, to the extent that applicant intended coupling release rod and coupling release tool to be coextensive, the intrinsic record is also indefinite as to the actual size of a "coupling release rod."

*Fig.7*




*Fig.10* *Fig.11*









’717 Patent at Figs. 7, 10, 11, 13A, and 13B.

Further, the fact that some figures in the ’717 Patent depict examples of “release rods” is not enough to provide objective guidance as to the nature and size of the release channel. *See Hockerson-Halberstadt, Inc. v. Avia Group Int’l*, 222 F.3d 951, 956 (Fed. Cir. 2000). For example. in *SmartSky*, a term was found to be indefinite where the only evidence offered for an “objective boundary” of a term was the figures. *SmartSky Networks, LLC v. Gogo Bus. Aviation, LLC*, No. 1:22-cv-00266, 2025 U.S. Dist. LEXIS 151928, at *13 (D. Del. Aug. 7, 2025). The figures depicting examples of the “release rods” alone cannot offer definiteness to the required size of those rods and or release channels.

Courts have found similar claims invalid. *See Automated Packaging Sys. v. Free Flow Packaging Int’l, Inc.*, No. 18-cv-00356, 2018 U.S. Dist. LEXIS 130122, at *48-51 (C.D. Cal. Aug. 2, 2018). In *Automated Packaging*, the Court considered the term “the gap is sized to permit insertion of a separating device,” and found it to be indefinite. *Id.* There, “[n]either the claims nor the patent specification identif[ied] a ‘separating device.’” *Id.* at 49. Rather, “the only mechanism specifically identified [was] a human hand.” *Id.* (citation modified). Because the patent offered no disclosures of a “separating device,” and only ever identified a “human hand” as exemplary, there was an “absence of any objective guidance” within the patent specification. *See id.* at 50. While the ’717 Patent does offer some guidance as to exemplary embodiments of a coupling release rod, the ’717 Patent offers little to no guidance as to a coupling release tool. Thus, it fails to offer any objective guidance on the scope of the patent claims as to the coupling release tool or the coupling

release channel.

*Third,* Claim 16 is indefinite for the same reasons described above with reference to Claims 1 and 20, and is indefinite for the additional reason that Claim 16 claims a single floor panel. Specifically, Claim 16 describes "***a floor panel*** comprising a female coupling formed along at least one first side of the floor panel for interconnecting the floor panel to a male coupling of a second floor panel." *See* '717 patent at cl. 6. The claim goes on to describe "a coupling release channel being arranged between the locking protrusion and an upper surface in the groove in the second floor panel, such that the coupling release tool is placeable in the coupling release channel." *See id.* Although the claim references a "second floor panel," that floor panel is not claimed. Therefore, a POSITA would not understand how to form the claimed coupling release channel with only the one claimed panel as it is described as between two panels throughout the intrinsic record. *See* '717 Patent at 11:5-13. The "coupling release channel" is never described as a distinct structural element of a singular panel. *See id.* Similarly, because a POSITA would not understand how to form a coupling release channel in one panel, "the coupling release tool … placeable in the coupling release channel" is also indefinite. A POSITA would be unable to understand with reasonable certainty how a coupling release tool could be placed in a coupling release channel that exists in only one panel.

### C. "[for engaging]/[can engage] the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means" (Claims 1, 16, 18, 19, 20).

These phrases are indefinite because it is not reasonably certain what is required "to release the horizontal locking" and "to release the vertical locking means." The claim language requires that the female coupling tongue is depressed "to release" the "horizontal locking from the locking protrusion" and/or "the vertical locking means." But the claims, and patent as a whole, do not inform with reasonable certainty what is required to release these elements as claimed.

The claims are silent as to what is required "to release" the "horizontal locking from the locking protrusion" and/or "the vertical locking means." Each independent claim of the patent recites this limitation based on the functional capabilities of the "coupling release tool." Specifically, the claims describe that the coupling release tool can engage "the female coupling tongue, to depress the female coupling tongue ***to release*** the horizontal locking from the locking protrusion and/or to release of the vertical locking means." But the claims provide no guidance as to what is required for the claimed releases.

The specification's only discussion of this claim limitation describes that "the female coupling tongue 32 will be pressed downwards until the locking protrusion 31 releases the male coupling tongue 40 such that it can horizontally move in order to release the vertical locking means 50, 60, as is shown in further detail in FIG. 12." *See* '717 Patent at 11:20-24. But then Figure 12 shows that, in addition to depressing the female coupling tongue, the coupling release rod 110 also pushes the second floor panel 20 upwards. And even then, the locking protrusion 31 of the female coupling tongue is still in contact with the male coupling tongue 40 and unable to freely move horizontally. Likewise, the vertical locking means 50, 60 in Figure 12 are in contact and not released as claimed.

***Fig.12***



This ambiguity leaves the public guessing as to how much the female coupling tongue must be depressed to meet the claim limitation. Do the claims only require that the female coupling tongue be nominally depressed—and other unclaimed actions (such as the upward movement of the second floor panel shown in Figure 12) can be combined to release the horizontal locking and/or vertical locking means? Or do the claims require that releasing the horizontal locking and/or vertical locking means be achieved exclusively by depressing the female coupling tongue? And in either event, what level of clearance is required for "release?" Without objective boundaries, the skilled artisan has no way to determine the scope of the claims, rendering them indefinite. *Akamai Techs., Inc.*, 159 F.4th at 1378.

## VI. CONCLUSION

For these reasons, Defendants and Counterclaim-Plaintiffs respectfully request that the Court find that the '717 Patent is indefinite for failing to provide objective boundaries to the scope of its invention as to the Coupling Release Channel Terms, the Locking Release Terms, and the Measurement Terms.

Dated: June 22, 2026

Respectfully submitted,

/s/ Kelly E. Farnan
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Counsel for Mohawk Industries, Inc., Menard, Inc., Mohawk Carpet Distribution, LLC, IVC US, LLC, and Unilin BV*

OF COUNSEL:

John Haynes (GA Bar No. 340599)
John.Haynes@alston.com
Shri Abhyankar (GA Bar No. 484680)
Shri.Abhyankar@alston.com
Eric Pettis (GA Bar No. 360485)
Eric.Pettis@alston.com
Carter Babaz (GA Bar No. 577033)
Carter.Babaz@alston.com
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree St. NE
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I caused the forgoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)