**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VILOX AB,<br><br>Plaintiff,<br><br>v.<br><br>MOHAWK INDUSTRIES, INC., MENARD, INC.<br><br>Defendants. | ) | C.A. No. 24-1430-JLH<br><br>DEMAND FOR JURY TRIAL |
| MOHAWK INDUSTRIES, INC., MOHAWK CARPET DISTRIBUTION, LLC, IVC US, LLC, and UNILIN BV,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>VILOX AB<br><br>Counterclaim-Defendant. | ) | |
| MENARD, INC,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>VILOX AB<br><br>Counterclaim-Defendant. | ) | |

**PLAINTIFF VILOX AB'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INDEFINITENESS**

## TABLE OF CONTENTS


I. Nature and Stage of Proceedings ........ 6

II. Summary of Argument ........ 6

III. Statement of Relevant Facts ........ 7

A. The ’717 Patent Describes the “Measurement Terms.” ........ 7

B. The ’717 Patent Describes the “Coupling Release Terms.” ........ 8

C. The ’717 Patent Describes the “Locking Release Terms.” ........ 8

IV. Argument ........ 9

A. The Measurement Terms Are Not Indefinite (Claims 1, 4, 15, 16, 20). ........ 9

1. An ordinary artisan would have understood “wherein the lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof . . .”/ “distal surface of the female coupling tongue” according to its plain and ordinary meaning (Claims 1, 4, 15, 16, 20). ........ 9

2. An ordinary artisan would have understood “distal surface of the main portion of the second floor panel” according to its plain and ordinary meaning (Claim 15). ........ 13

B. The Coupling Release Channel Terms Are Not Indefinite (Claims 1, 16, 18, 19, 20). ........ 14

1. The “coupling release channel” is not indefinite because an ordinary artisan would have understood its location and bounds. ........ 14

2. The Accused Products do not establish indefiniteness. ........ 18

3. The “coupling release tool” is also not indefinite. ........ 19

4. Claim 16 is definite because it recites a “second floor panel.” ........ 22

C. The Locking Release Terms Are Not Indefinite (Claims 1, 16, 18, 19, 20). ........ 23

V. Conclusion ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. MediaPointe, Inc.*,
159 F.4th 1370 (Fed. Cir. 2025) ....................20

*Arthrex, Inc. v. Smith & Nephew, Inc*,
No. 2:15-CV-1047-RSP, 2016 WL 4211504 (E.D. Tex. Aug. 10, 2016)....................6

*Automated Packaging Systems v. Free Flow Packaging Int'l, Inc.*,
No. 18-CV-00356-EMC, 2018 WL 3659014 (N.D. Cal. Aug. 2, 2018) ....................17

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017)....................4, 10

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
783 F.3d 1374 (Fed. Cir. 2015)....................10

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
35 F.4th 1345 (Fed. Cir. 2022) ....................7

*Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*,
No. CV 17-668-LPS-CJB, 2019 WL 2897701 (D. Del. July 5, 2019) ....................13

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
93 F.3d 1572 (Fed. Cir. 1996)....................18

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018)....................13, 14

*Exxon Chem. Pats., Inc. v. Lubrizol Corp.*,
64 F.3d 1553 (Fed. Cir. 1995)....................18

*Hockerson-Halberstadt v. Avia Group Int'l*,
222 F.3d 951 (Fed. Cir. 2000)....................16

*IQRIS Techs. LLC v. Point Blank Enters., Inc.*,
130 F.4th 998 (Fed. Cir. 2025) ....................5

*Ironburg Inventions Ltd. v. Valve Corporation*,
64 F.4th 1274 (Fed. Cir. 2023) ....................5, 6

*Nature Simulation Sys. Inc. v. Autodesk, Inc.*,
50 F.4th 1358 (Fed. Cir. 2022) ....................19

*Nautilus, Inc. v. BioSig Instruments*,
572 U.S. 898 (2014)....................4, 10, 14, 15

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) .................... *passim*

*Saso Golf, Inc. v. Nike, Inc.*,
843 F. App'x 291 (Fed. Cir. 2021)....................6

*Sight Scis., Inc. v. Ivantis, Inc.*,
No. CV 21-1317-GBW-SRF, 2023 WL 5287215 (D. Del. Aug. 17, 2023) ....................13

*Smartsky Networks, LLC v. Gogo Bus. Aviation, LLC*,
No. 1:22-CV-00266-JDW, 2025 WL 2255650 (D. Del. Aug. 7, 2025) ....................17

*Sonix Tech. Co., Ltd. v. Pubs. Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017)....................12

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)....................6

**Statutes**

35 U.S.C. § 112(b) ....................1

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| **1** | Declaration of Dr. Sorensen |
| **2** | Excerpted File History of U.S. Patent No. 12,180,717 |
| **3** | Mohawk's Identification of Claim Terms for Construction (March 27, 2026); |
| **4** | Mohawk's Identification of Preliminary Claim Constructions (April 24, 2026) |

## I. NATURE AND STAGE OF PROCEEDINGS

Plaintiff VILOX AB accuses Defendants Mohawk Industries Inc., Menard Inc., and Unilin BV of, among other things, infringing U.S. Patent No. 12,180,717. D.I. 83. A *Markman* hearing is set for September 25, 2026. D.I. 42. Fact discovery is ongoing. *Id*. Trial is currently scheduled for September 2027. *Id*.

Defendants seek summary judgment that three sets of claim terms, identified below, are indefinite under 35 U.S.C. § 112(b). Vilox opposes because a person of ordinary skill in the art would have understood the scope of the ’717 patent claims with reasonably certainty.

| |
|---|
| ***The Measurement Terms:*** “lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling tongue” (Claims 1, 16, 20); “wherein the lower recess is defined by an inclined surface extending a distance from a distal surface of the female coupling tongue to between 60% to 90% of the length of the female coupling tongue” (Claim 4); and “a horizontal distance from a distal surface of the female coupling tongue and a distal surface of the main portion of the second floor panel is between 5% and 15% of the length of the female coupling member” (Claim 15) |
| ***The Coupling Release Terms:*** “coupling release channel” and “such that the coupling release tool is placeable in the coupling release channel” (Claims 1, 16, 18, 19, 20) |
| ***The Locking Release Terms:*** “[for engaging]/[can engage] the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means” (Claims 1, 16, 18, 19, 20) |

## II. SUMMARY OF ARGUMENT

1. Defendants have not proven indefiniteness of the measurement terms by clear and convincing evidence where the claims and specification describe how to measure the claimed distances, and undisputed expert testimony shows an ordinary artisan would have understood the claims’ scope with reasonable certainty.

2. Defendants have not proven indefiniteness of the coupling release terms by clear and convincing evidence where the claims and specification describe the “coupling release channel”

and "coupling release tool," and undisputed expert testimony shows an ordinary artisan would have understood the claims' scope with reasonable certainty.

3. Defendants have not proven indefiniteness of the locking release terms by clear and convincing evidence where the claims and specification disclose a female coupling tongue depressed to release horizontal locking, vertical locking, or both, and undisputed expert testimony shows an ordinary artisan would have understood the claims' scope with reasonable certainty.

## III. STATEMENT OF RELEVANT FACTS

The asserted '717 patent discloses an improved joining system for flooring panels. The claims recite an innovative interlocking profile between a one-piece female coupling and a one-piece male coupling. *See* '717 Patent at 16:18-22; claim 1.

### A. The '717 Patent Describes the "Measurement Terms."

The '717 patent describes the female coupling tongue as having a "lower recess 33" that extends for a distance D, measured "from a distal surface 44 of the female coupling tongue 32 to between 60% and 90% of the length C of the female coupling tongue." *Id.* at 12:51-57; *see id.* at 3:4-15. Figure 1B, annotated below, illustrates how to measure the lower recess's length (D): from the end surface of the female tongue in the horizontal dimension:




*Id.* at Figs. 1A-1B (excerpted and annotated).

An ordinary artisan would have understood "distal surface of the female coupling tongue" to define one end of the lower recess in the horizontal dimension. Ex. 1, Declaration of Dr. Sorensen ("Sorensen Dec.") at ¶¶ 31-43. An ordinary artisan would similarly have understood "distal surface of the main portion of the second floor panel" to be the farthest surface of the main portion of the second floor panel before the male tongue. *Id*. at ¶¶ 44-49.

**B. The '717 Patent Describes the "Coupling Release Terms."**

The claimed flooring panels include a coupling release channel that can receive a coupling release tool to disassemble installed floor panels. The patent describes coupling release channel 41 as a space formed between the male and female coupling tongues "when the male coupling is locked in the female coupling." *Id*. at 11:5-13; *see id.* at Figs 4, 12, 13B, 19, 21, 23. An ordinary artisan would have understood the dimensions of this "coupling release channel" with reasonable certainty. Sorensen Dec. at ¶ 50-58.

The '717 patent explains that when a coupling release tool or rod is inserted "into the coupling release channel 41, the female coupling tongue 32 will be pressed downwards until the locking protrusion 31 releases the male coupling tongue 40 such that it can horizontally move in order to release the vertical locking means 50, 60." *Id*. at 11:19-24. An ordinary artisan would have understood "coupling release tool" with reasonable certainty. Sorensen Dec. at ¶ 59-64.

**C. The '717 Patent Describes the "Locking Release Terms."**

The '717 patent explains that depressing the female coupling tongue releases horizontal and vertical locking mechanisms. '717 Patent at 15:23-39. For example, figure 12 illustrates an exemplary embodiment where rotation of coupling release rod 110 depresses female coupling tongue 32, releasing the male coupling tongue 40 (allowing horizontal movement) and the vertical locking means 50, 60 (allowing vertical movement). *Id*. A person of ordinary skill in the

art, reviewing the ’717 patent, would have understood how depressing the female coupling tongue allowed release of these components, as claimed. Sorensen Dec. at ¶ 65-68.

## IV. ARGUMENT

Defendants have not carried their burden of showing indefiniteness by clear and convincing evidence. *Nautilus, Inc. v. BioSig Instruments*, 572 U.S. 898, 912 n.10 (2014). Definiteness “does not require absolute or mathematical precision,” only a reasonable certainty of the claims’ scope. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017); *see also Nautilus,* 572 U.S. at 910. Here, the claimed elements, their relative locations, and their interactions are well described by the ’717 patent. And Dr. Sorensen’s declaration—the only expert testimony in the record—establishes the claims’ scope would have been reasonably certain to an ordinary artisan. Defendants’ motion should accordingly be denied.

### A. The Measurement Terms Are Not Indefinite (Claims 1, 4, 15, 16, 20).

#### *1. An ordinary artisan would have understood “wherein the lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof . . .”/ “distal surface of the female coupling tongue” according to its plain and ordinary meaning (Claims 1, 4, 15, 16, 20).*

The “measurement terms” are not indefinite because an ordinary artisan would have understood how to measure the length of the claimed lower recess with reasonable certainty. Sorensen Dec. at ¶¶ 31-43. The ’717 patent consistently instructs the reader to measure the lower recess from the “distal surface” from which the recess extends. For example, claim 1 describes the “lower recess” as extending “from a distal surface [of the female coupling tongue] to between 60% and 90% of the length of the female coupling tongue.” Consistent with this claim language, Figure 1B illustrates a distance D, measured “from the distal surface 44 of the female coupling tongue 32 to between 60% to 90% of the length C of the female coupling tongue 32[:]”




*Id.* at Figs. 1A-1B (excerpted and annotated).

An ordinary artisan would have understood "distal surface of the female coupling tongue" in the same way the patent uses it: to refer to the surface of the female coupling tongue that defines the end of the lower recess in the horizontal dimension. Sorensen Dec. at ¶ 31, 36.

Defendants complain of alleged inconsistency between Figure 1B and Figures 1A and 2 because distal surface 44 is identified by a leader line that touches the female tongue's corner. But Defendants err in assuming that Figures 1A and 2 identify the distal surface as the precise point the leader line touches. An ordinary artisan would have understood that "the leader for reference numeral 44 identifies the distal end surface as a structural feature, rather than identifying the exact point from which a horizontal dimension must be taken." Sorensen Dec. at ¶ 40. Dr. Sorensen explains, "Figure 1B separately provides the relevant horizontal dimensional datum for lengths D and C." *Id.* Thus, Figures 1A, 1B, and 2 complement rather than contradict one another. *Id.* In any event, claims are not limited to disclosed embodiments. *IQRIS Techs. LLC v. Point Blank Enters., Inc.*, 130 F.4th 998, 1004 (Fed. Cir. 2025) (Claims, not preferred embodiments, define the metes and bounds of the invention).

Defendants' motion should fail for the same reason that the patent challenger in *Ironburg Inventions Ltd. v. Valve Corporation* failed. 64 F.4th 1274, 1290 (Fed. Cir. 2023). In *Ironburg,*

the Federal Circuit found a measurement term definite despite a dispute "about the application of an agreed-upon, straightforward methodology" to measure distance. In that case, the parties did not dispute *how* to measure distance but "*where* to measure." *Id.* The court found the term was not indefinite because the specification told an ordinary artisan where to measure via illustrative figures and by describing the purpose of the element being measured. *Id.* Here, too, Figure 1B illustrates how and where to measure the distance, and the patent describes the purpose of the "lower recess," providing reasonable certainty to an ordinary artisan. Sorensen Dec. at ¶¶ 31-36.

Defendants' caselaw is unavailing. In *Saso Golf, Inc. v. Nike, Inc.*, the patent challenger's three experts testified that an ordinary artisan would not know how to make a measurement, the patent owner's expert "did not opine" on the issue, and the patent provided "no guidance." 843 F. App'x 291, 295-97 (Fed. Cir. 2021). But here the specification expressly explains where and how to measure the lower recess, and the only expert testifies that an ordinary artisan would have known where and how to make the measurement. *Arthrex, Inc. v. Smith & Nephew, Inc*, involved the lack of "objective boundaries" between the terms "absolute end" and "most distal end." No. 2:15-CV-1047-RSP, 2016 WL 4211504, at *42 (E.D. Tex. Aug. 10, 2016). No such confusion exists here. And *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, relates to uncertainty among multiple possible ways to measure molecular weight. 789 F.3d 1335, 1341 (Fed. Cir. 2015). But here the parties agree that distance "D" is a straightforward horizontal measurement.

Defendants' arguments regarding infringement serve only to demonstrate genuine issues of material fact. Defendants manufacture a false distinction between "the farthest edge of the female coupling tongue" and "the rounded top edge." Using this false distinction, Defendants contend that "Vilox measures the accused products from the farthest edge of the female coupling tongue . . . and not from the rounded top edge that the patent labels as 'distal surface 44.'" Mot.,

11-12. But, as discussed above, this measurement is entirely consistent with the ’717 specification, which makes measurement D from “distal surface 44 of the female coupling tongue.” ’717 Patent at 12:40-44. There is *one distal surface 44* that includes the rounded corner and the vertical surface, and measurement D is taken from the farthest point.

Defendants annotate a figure from the infringement contentions to illustrate their noninfringement position:




Mot., 13. But this line-drawing exercise demonstrates—at most—that the parties disagree about features in the accused product, precluding summary judgment.[1] It does not show indefiniteness. *See ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir. 2022) (being “susceptible to more than one meaning does not render [a term] indefinite” as “[s]uch a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction”) (citation omitted)).

Further demonstrating that factual arguments plague Defendants’ motion, Defendants contend they do not infringe because the claims require “the lower recess is defined by ***an*** inclined surface.’” Mot. 12, fn1. But only claim 4 recites a recess defined by “an inclined

[1] Neither party has proffered infringement or noninfringement expert reports at this early stage in the case, and the attorney argument in Defendants’ footnote neither establishes the facts asserted nor demonstrates that the facts asserted—if true—provide any viable noninfringement position.

surface," meaning this is not required other claims. And whether the accused products' recess meets this limitation presents issues of material fact, precluding summary judgment.

Defendants' contentions about the prosecution history are also wrong. Defendants err in contending that the Examiner "relied on" the patent applicant's representation that "this claim limitation 'is critical to the operation of the claimed invention'" as "providing a basis for allowance." Mot., 13-14. The Examiner said no such thing, but instead explained that "the prior art of record" does not disclose the limitation. Ex. B at VILOX001168. Further, Defendants contend, "[b]ecause this claim term provides an alleged point of novelty, it is critical that it can be understood with reasonable certainty." Mot. 14. But Defendants cite no authority for their suggestion that whether a term "provides an alleged point of novelty" triggers a "critical" standard. To the contrary, the same statutory standard of definiteness—reasonable certainty—applies to all terms. And Defendants bear the same burden—clear and convincing evidence—to show indefiniteness. They have not carried this burden.

***2. An ordinary artisan would have understood "distal surface of the main portion of the second floor panel" according to its plain and ordinary meaning (Claim 15).***

Defendants fail at their attempts to manufacture ambiguity in the "distal surface of the main portion of the second floor panel." An ordinary artisan would have understood this phrase to refer to the farthest surface of the panel's main body. Sorensen Dec. at ¶¶ 44-49.

As explained by Dr. Sorensen, the "main portion of the second floor panel" in claim 15 refers to the main body of the floor panel in contrast to the coupling components forming the floor panel's ends. Sorensen Dec. at ¶ 45. Consistent with this claim language, the specification says the "main portion" (220) of the floor panel "is to be considered as that portion of the panel . . . that does not include the actual joining system. I.e. the main material of each panel that is not affected by the female and male coupling respectively." '717 Patent at 9:43-47. Thus, the

"distal surface" of the "main portion" of the second floor panel is the farthest edge before the male coupling geometry (i.e., "joining system") begins. Sorensen Dec. at ¶ 45.

Defendants again engage in arbitrary line drawing on the accused product, raising factual disputes about infringement. They dispute the identification of the distal surface in the accused product, arguing that it must be a "vertical surface" not recited in the claims. This factual dispute about the accused product is properly the subject of expert discovery relating to infringement, not indefiniteness. At most, this shows that genuine fact issues preclude summary judgment.

### B. The Coupling Release Channel Terms Are Not Indefinite (Claims 1, 16, 18, 19, 20).

Defendants' indefiniteness arguments regarding the "coupling release channel" and "coupling release tool" fail because the '717 claims and specification provide sufficient guidance as to the terms' relative size and boundary structures as well as their relation to other claim elements. The specification and figures illustrate exemplary embodiments, supporting an ordinary artisan's understanding of the claims. Defendants' arguments, unsupported by either expert testimony or relevant case law, cannot carry the heavy burden that summary judgment demands.

#### *1. The "coupling release channel" is not indefinite because an ordinary artisan would have understood its location and bounds.*

The "coupling release channel" term is not indefinite, as the intrinsic record would have provided an ordinary artisan with reasonable certainty as to its scope. Sorensen Dec. at ¶¶ 50-55.

Defendants' argument regarding the "coupling release channel" hinges on their demand for "specific measurements relating to the size of the channel." Mot. at 17. But Defendants cite no support for this demand. *See* Mot. at 16-18 (citing no precedent). The Federal Circuit consistently holds that definiteness does not demand numerical precision. *See, e.g., Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) (stating that "[w]hile there must be objective boundaries, 'we have explained that 'a patentee need not define

his invention with mathematical precision in order to comply with the definiteness requirement'" (citation omitted)); *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382-83 (Fed. Cir. 2015) (reversing indefiniteness of "spaced relationship" where the "claim language, specification, and the figures illustrating the 'spaced relationship' . . . provide sufficient clarity" to an ordinary artisan); *Nautilus*, 572 U.S. at 909 (explaining that "absolute precision" in claim drafting "is unattainable" and not the standard for definiteness). And a claim is not indefinite just because it is broad. *Niazi Licensing Corp.*, 30 F.4th at 1347; *BASF Corp.*, 875 F.3d at1367.

From the '717 patent's claims, an ordinary artisan would have understood the coupling release channel's location, its boundaries, and its interaction with other elements of the claimed "joining system." *See* '717 Patent at cls. 1, 20. The claims expressly recite the structures bounding the coupling release channel: "the locking protrusion and an upper surface in the groove in the second floor panel." *Id.* The claims explain that the "locking protrusion": "protrude[s] from the female coupling tongue"; is "in a direction towards the main floor surface plane"; is "arranged to receive a groove in the second floor panel for horizontal locking of the panels"; "is configured to come into contact with the male coupling tongue during joining of the first and second floor panels"; and is part of a "horizontal lock[]." *Id.* The claims further explain that "the groove": "receive[s]" the locking protrusion; is located "in the second floor panel"; has an "upper surface"; and is part of a "horizontal lock[]." *Id.* They also recite that the coupling release channel accommodates a coupling release tool to facilitate the "release" of the joining system. *Id.* Because the coupling release channel is directly above the locking protrusion, the release channel serves as an access point to "depress the female coupling tongue to release the horizontal lock[]" via a "coupling release tool." *Id.* Thus, having only read the claims, an ordinary artisan would have understood that the coupling release channel (1) "is bounded on one

side by the locking protrusion of the first floor panel and on the other side by an upper surface in the groove of the second floor panel"; and (2) "is sized to receive a coupling release tool that depresses the female coupling tongue, facilitating release of one panel from the other." Sorensen Dec. at ¶ 51. Knowing the coupling release channel's location, boundaries, and interaction with other elements, an ordinary artisan would have been reasonably certain of the term's scope. *Id.*

Beyond the claims, the specification and figures provide even more basis for the ordinary artisan's reasonable certainty regarding the scope of the claims. Sorensen Dec. at ¶¶ 52-53. An ordinary artisan would have understood that the coupling release channel is formed "when the male coupling is locked in the female coupling." '717 Patent at 11:5-9, 11:13-17; Sorensen Dec. at ¶ 54. The specification also provides preferred *relative dimensions* of the coupling release channel. '717 Patent at 11:13-18. In one embodiment, the coupling release channel has a "distance M" that may be "between 10% and 40%" or "between 15% to 25%" "of the thickness Q of the first and second panel 10, 20." *Id.* Figure 4, annotated below, illustrates this:




'717 Patent at Fig. 4.

The '717 figures depict half a dozen embodiments of the coupling release channel, confirming that the coupling release channel is not limited by size or shape, so long as it is

bounded by the upper surface of the groove 71 and the female locking protrusion 31, as claimed. *See id.* at cls. 1, 20, Figs. 4, 12, 13B, 19, 21, 23.




’717 Patent Figs. 4, 12, 13B, 19, 21, 23 (annotated).

Defendants’ attempts to sidestep the extensive guidance provided by the ’717 patent’s exemplary embodiments by calling them “optional” or “unclaimed” misses the point. The Federal Circuit has explained that “examples in the written description help[] provide sufficient guidance to render the claims not invalid as indefinite.” *Niazi Licensing Corp.*, 30 F.4th at 1349-50 (finding term not indefinite where specification provided “numerous examples” of the claimed design); *see also Sonix Tech. Co., Ltd. v. Pubs. Int’l, Ltd.*, 844 F.3d 1370, 1377-79 (Fed.

Cir. 2017) (finding "visually negligible" definite where the specification provided "a general exemplary design for a visually-negligible indicator," "requirements" to be considered visually negligible, and two "specific examples"); *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1345 (Fed. Cir. 2018) (affirming definiteness of "elongated and substantially straight" lawnmower baffle in view of guidance in specification and figures).

Delaware cases agree that exemplary embodiments in the specification and figures *help* an ordinary artisan; they do not "highlight[] the indefiniteness issue," as Defendants would like this court to believe. Mot. at 19. *See, e.g.*, *Sight Scis., Inc. v. Ivantis, Inc.*, No. CV 21-1317-GBW-SRF, 2023 WL 5287215, at *5 (D. Del. Aug. 17, 2023) (denying indefiniteness because non-limiting disclosures in the specification "provide[] objective guidance" to an ordinary artisan); *Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*, No. CV 17-668-LPS-CJB, 2019 WL 2897701, at *8 (D. Del. July 5, 2019) (finding no indefiniteness because "the patent specifications *do* provide examples of structures that embody the relevant claims . . . [a]nd the claims also *do* provide information regarding the required elements," which provide "boundaries for a POSA to use as guideposts").

***2. The Accused Products do not establish indefiniteness.***

Defendants' reliance on the infringement contentions to argue indefiniteness is again misplaced. Attempting to recharacterize the coupling release channel Vilox identified in the accused products as "simply the space that inevitably exists" between the accused floor panels, Defendants contend "Vilox provides no evidence that a 'coupling release tool is placeable in'" its coupling release channel "that inevitably exists." Mot. at 19. This infringement question raises genuine fact issues to be developed via fact and expert discovery, not indefiniteness amendable to resolution during the claim-construction phase. *See* Sorensen Dec. at ¶ 54.

### *3. The "coupling release tool" is also not indefinite.*

For the "coupling release tool," Defendants repeat their legally unsupported complaints about the size of the claimed components. Again, "reasonable certainty" does not mean mathematical precision, as Defendants demand. *Niazi Licensing Corp.*, 30 F.4th at 1347. The "coupling release tool" term is not indefinite, as the intrinsic record would have provided an ordinary artisan with reasonable certainty as to its scope. Sorensen Dec. at ¶¶ 59-64.

Defendants' arguments ignore that the claims and specification sufficiently define the claimed "coupling release tool." The claims specify the tool is "placeable in the coupling release channel." '717 Patent at cl. 1, 16, 20. The tool's outer dimensions are, therefore, defined by the size of this channel. *See id.* Any tool that fits in the coupling release channel meets this limitation; any tool that does not, does not. The claims further say the tool "engage[s] the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means." *Id*. The claims thus specify that the coupling release tool be capable of: (1) being placed within the coupling release channel; (2) engaging (i.e., contacting) the female coupling tongue; and (3) depressing the female coupling tongue sufficiently to release the horizontal locking, the vertical locking, or both. *Id.* These recitations help bound the claims' scope by specifying the form the coupling release tool must take. *See Exmark*, 879 F.3d at 1346 (one skilled in the art would understand structure from limitations reciting operation of claim feature) (citations omitted).

The '717 specification and figures, important guideposts under *Nautilus*, provide multiple examples of the coupling release tool. '717 Patent at 7:60–8:8, Figs. 7-13C; *Nautilus*, 572 U.S. at 910. Figures 7, 10 and 11, for example, illustrate the shapes and relative dimensions of embodiments of the coupling release rod:







*Id.* at Figs. 7, 10, and 11; *see also id.* at 14:53–67 (describing the shape and relative dimensions of coupling release rod 110).

Additionally, Figure 12 shows an embodiment of the coupling release rod depressing the female coupling tongue 32 by turning like a key:




*Id.* at Fig. 12; *see id.* at *Id.* at 15:23-39.

The embodiments of the coupling release rod depicted in the figures—including rods with linear tapering (Fig. 7), concave tapering (Fig. 8), generally rectangular cross-sections (Fig. 10), generally rectangular but more rounded at the edges cross-sections (Fig. 11), and perpendicular manipulation handles (Figs. 13A, 13B, 13C)—confirms the coupling release tool is not limited to a particular shape, cross-section, or geometry, so long as the tool can (i) enter the coupling release channel, (ii) engage the female coupling tongue, and (iii) depress the tongue to release the locking. *See id.* at cls. 1, 20; Figs. 7–13.

An ordinary artisan would have understood this term with reasonable certainty. Sorensen Dec. at ¶¶ 59-64. For example, an ordinary artisan would have understood that the tapered rod portion would allow the coupling release rod to depress the female coupling tongue by virtue of sliding the coupling release rod into the coupling release channel. *Id.* at ¶ 61. Further, an ordinary artisan would have understood coupling release rod 110 to be an example of the claimed "coupling release tool." *Id.* at 62. Indeed, the specification assigns numeral 110 to both the rod and the tool. *See, e.g.*, '717 Patent at 11:5-9 (explaining that the "coupling release channel 41" receives "a coupling release rod 110"), 19:6-8 (explaining that "the first and second panel 10, 20 may further be released by means of the coupling release tool 110"). And the '717 specification and Figures describe coupling release rod 110 being used as a tool, to cause release of adjacent panels. '717 Patent at 11:5-9.

This is consistent with the prosecution history—where Vilox changed "coupling release rod" to "coupling release tool" to address an examiner concern about antecedent basis, never suggesting that the terms were mutually exclusive. Ex. 2 at VILOX000910 (Applicant stating that "regarding claim 11, Applicant has replaced 'rod' with 'tool'"). During examination the Examiner had noted that while it was "unclear if the 'coupling recess rod' is referring to the previously introduced 'coupling release tool,'" "it appears the rod is referring to the tool of claim 1." Ex. B at VILOX000870-871. An ordinary artisan reading the claims, specification, and prosecution history would have understood it the same way. Sorensen Dec. at ¶ 61.

Defendants' caselaw is unavailing. First, *Hockerson-Halberstadt v. Avia Group Int'l* dealt with prosecution history disclaimer, not indefiniteness. 222 F.3d 951, 956 (Fed. Cir. 2000). At any rate, the specification in that case was "completely silent on the [relevant] issue." *Id.* Not so here, where the specification contains extensive description of the terms at issue.

Second, *Smartsky Networks, LLC v. Gogo Bus. Aviation, LLC* is inapposite as it involved a claim term not mentioned in the specification. No. 1:22-CV-00266-JDW, 2025 WL 2255650, at *4 (D. Del. Aug. 7, 2025). That court found the term indefinite because the intrinsic record provided no "objective boundary" of the claim term. But the '717 patent is filled with descriptions and figures of the "coupling release channel" and "coupling release tool" terms.

Third, *Automated Packaging Systems v. Free Flow Packaging Int'l, Inc.*, is inapposite because the only disclosed embodiment of the claimed "separating device" was a human hand and the only testimony was that an ordinary artisan would have understood the separating device to be somewhere between the size of a "needle" and a "baseball bat." No. 18-CV-00356-EMC, 2018 WL 3659014, at *17-18 (N.D. Cal. Aug. 2, 2018). Here, the '717 patent describes and illustrates several embodiments of the coupling release tool. And Defendants have proffered *no* evidence that an ordinary artisan would not have understood the approximate physical size of the claimed coupling release channel and coupling release tool.

***4. Claim 16 is definite because it recites a "second floor panel."***

Defendants next argue that—despite reciting "a floor panel" and a "second floor panel" —claim 16 only "claims a *single* floor panel." Mot. at 23 (acknowledging that "the claim references a '*second* floor panel'") (emphasis added). Claim 16 not only "references" a "second floor panel;" it recites it *sixteen* times. *See* '717 Patent at cl. 16 (reciting, for example, "a coupling release channel being arranged between the locking protrusion and an upper surface in the groove in *the second floor panel*") (emphasis added). "Second floor panel" appears *seven additional times* in claims depending from claim 16. *See* '717 Patent at cls. 17-19. Defendants say nothing more about why "second floor panel" is "not claimed" or why claim 16 could be limited to a "single floor panel." *See* Mot. at 23.

The Federal Circuit has rejected similar attempts to read elements out of claims. *See, e.g.*, *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996) (recognizing that the court cannot "read [a] limitation out of the claim" and must rather "give meaning to all the words in [the] claims") (quoting *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995)). Defendants' argument depends on a claim construction position (that claim 16 "claims a single floor panel") that they have never made and have thus waived. *See* Ex. 3 (Mohawk's Identification of Claim Terms for Construction) (March 27, 2026); Ex. 4 (Mohawk's Identification of Preliminary Claim Constructions) (April 24, 2026); D.I. 85 (Joint Claim Construction Chart) (May 22, 2026).

An ordinary artisan reading the claims in light of the intrinsic record, would have understood the first and second panels of claim 16 define the claimed "coupling release channel" with reasonable certainty. *See* Sorensen Dec. at ¶¶ 56-58. Consistent with the '717 specification, the ordinary artisan "would have understood claim 16 to claim a floor panel whose female coupling is configured to form at least part of a coupling release channel when the floor panel is joined with the recited second floor panel." *Id*. at ¶ 57.

### C. The Locking Release Terms Are Not Indefinite (Claims 1, 16, 18, 19, 20).

Defendants' attempts to inject ambiguity into the "locking release" terms also fall short. Mot. at 23-25. After conceding that the claims recite "*depress[ing] the female coupling tongue to release*" the horizontal or vertical locking means, Defendants ask: "what is required to release these elements?" *Id.* The claims and specification answer this question.

Figure 12 shows how depressing the female coupling tongue releases the horizontal lock (40, 31) and vertical lock (50, 60), providing guidance about the terms' scope. '717 Patent at Fig. 12, 15:23-39; Sorensen Dec. at ¶¶ 67-68. And, contrary to Defendants' contentions, the claims'

open-ended language does not preclude the coupling release tool 110 from depressing the female coupling tongue and *also* "push[ing] the second floor panel 20 upwards." Mot. at 24.




*Id.* at Fig. 12

From this, an ordinary artisan would have understood that releasing horizontal or vertical locking requires sufficient depression of the female coupling tongue to remove the locking engagement between the male and female coupling tongues. Sorensen Dec. at ¶¶ 67-68. Thus, the "locking release terms" are not indefinite because an ordinary artisan would have understood them with reasonable certainty. Sorensen Dec. at ¶¶ 65-68.

Turning to the "level of clearance . . . required for release," Defendants again demand a numerically precise answer. Mot. at 25. But reasonable certainty does not require this precision. *Niazi Licensing Corp.*, 30 F.4th at 1347. Even if the extent Defendants still have "unanswered questions" about the claim language, the Federal Circuit takes no issue. *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1366 (Fed. Cir. 2022) (explaining that "[t]he claims set forth the metes and bounds of the invention; they are not intended to repeat the detailed operation of the method as described in the specification"). Defendants' single case citation relates to a claim for finding the "best" or "optimal" navigation route; Defendants make no argument as to

what bearing, if any, it has on this case. Mot. at 25 (citing *Akamai Techs., Inc. v. MediaPointe, Inc.*, 159 F.4th 1370, 1378 (Fed. Cir. 2025)). Here, the claim language identifies (i) the actor (the coupling release tool), (ii) the action (depressing the female coupling tongue), and (iii) the result (release of horizontal locking and/or vertical locking means). That is definite by any measure.

## V. CONCLUSION

For the foregoing reasons, Vilox respectfully asks the Court to deny Defendants' Motion.

Dated: July 17, 2026

Respectfully submitted,

MCCARTER & ENGLISH, LLP

*/s/ Daniel M. Silver*

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

Smith R. Brittingham IV (admitted *pro hac vice*)
Jeffrey C. Totten (admitted *pro hac vice*)
Jonathan J. Fagan (admitted *pro hac vice*)
Abhinav Garg (admitted *pro hac vice*)
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, DC 20001-4413
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

Michael E. Kudravetz (admitted *pro hac vice*)
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
Two Seaport Avenue, Sixth Floor
Boston, MA 02210
Telephone: (617) 646-1600

*Attorneys for Plaintiff Vilox AB*