**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VILOX AB,<br><br>Plaintiff,<br><br>v.<br><br>MOHAWK INDUSTRIES, INC., MENARD, INC.<br><br>Defendants. | C.A. No. 24-1430-JCB<br><br>DEMAND FOR JURY TRIAL |
| MOHAWK INDUSTRIES, INC., MOHAWK CARPET DISTRIBUTION, LLC, IVC US, LLC, and UNILIN BV,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>VILOX AB<br><br>Counterclaim-Defendant. | |
| MENARD, INC.,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>VILOX AB,<br><br>Counterclaim-Defendant. | |

**JOINT CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS


I. REPRESENTATIVE CLAIMS ........ 7

II. AGREED-UPON CONSTRUCTIONS ........ 8

III. INTRODUCTION ........ 8

A. Plaintiff's Opening Position ........ 8

B. Defendants' Responsive Position ........ 9

C. Plaintiff's Reply Position ........ 10

D. Defendants' Sur-Reply Position ........ 10

IV. DISPUTED CONSTRUCTIONS ........ 10

A. TERM 1: "the male coupling tongue is rigid and nonresilient" ........ 10

1. Plaintiff's Opening Position ........ 11

2. Defendants' Responsive Position ........ 17

3. Plaintiff's Reply Position ........ 17

4. Defendants' Sur-Reply Position ........ 32

B. TERM 2: "wherein the fold-down joining system further comprises: [A] a coupling release channel… or [B] an inclined abutment surface on the male coupling tongue… or [C] an inclined abutment surface on the locking protrusion…; [D] wherein the lower recess…or [E] wherein the male coupling tongue..." ........ 36

1. Plaintiff's Opening Position ........ 37

2. Defendants' Answering Position ........ 43

3. Plaintiff's Reply Position ........ 49

4. Defendants' Sur-Reply Position ........ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10x Genomics, Inc. v. Parse Biosciences, Inc.*,
No. 22-1117, 2024 U.S. Dist. LEXIS 81505 (D. Del. May 3, 2024)....35

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
657 F.3d 1264 (Fed. Cir. 2011)....27

*Ajinomoto Co. v. Int'l Trade Comm'n*,
932 F.3d 1342 (Fed. Cir. 2019)....48, 63

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
457 F.3d 1293 (Fed. Cir. 2006)....19

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022)....35

*AstraZeneca AB v. Mylan Pharms. Inc.*,
19 F.4th 1325 (Fed. Cir. 2021)....21, 31

*Biogen Idec, Inc., v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013)....46, 47

*Bionx Implants, Inc. v. Linvatec Corp.*,
299 F.3d 1378 (Fed. Cir. 2002)....18

*Chimie v. PPG Industries, Inc.*,
402 F.3d 1371 (Fed. Cir. 2005)....18

*Copan Italia S.p.A. v. Puritan Medical Products Company LLC*,
2019 WL 5699078 (D. Me. 2019)....18

*DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*,
No. 2:12-cv-00764-WCB-RSP, 2015 U.S. Dist. LEXIS 3629 (E.D. Tex. Jan. 13, 2015)....45

*DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*,
No. 2:12-CV-00764-WCB-RSP, 2015 WL 164072 (E.D. Tex. Jan. 13, 2015)....56

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014)....36

*Flash-Control, LLC v. Intel Corp.*,
No. 2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021)....49, 54

*Gemtron Corp. v. Saint-Gobain Corp.*,
572 F.3d 1371 (Fed. Cir. 2009)....................15

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997)....................39, 56

*Golden Bridge Tech., Inc. v. Apple Inc.*,
758 F.3d 1362 (Fed. Cir. 2014)....................23

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ....................25

*Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*,
No. 18-313-CFC, 2021 U.S. Dist. LEXIS 53267 (D. Del. Mar. 22, 2021) ....................34

*Kustom Signals, Inc. v. Applied Concepts, Inc.*,
264 F.3d 1326 (Fed. Cir. 2001)....................45, 47, 50, 55

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
22 F.4th 1369 (Fed. Cir. 2022) ....................24

*Northern Telecom Ltd. v. Samsung Elecs. Co.*,
215 F.3d 1281 (Fed. Cir. 2000)....................61

*NTP, Inc. v. Research in Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) (*abrogated on other grounds Zoltek Corp. v. United States*, 672 F.3d 1309, 1320-21 (Fed. Cir. 2012)) ....................36

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)....................26, 45, 58

*Paragon Sols., LLC v. Timex Corp.*,
566 F.3d 1075 (Fed. Cir. 2009)....................17

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020)....................46, 47, 60, 64

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .................... *passim*

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018)....................17

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
438 F.3d 1123 (Fed. Cir. 2006)....................46, 59, 60

*Rally AG LLC v. Apple Inc.*,
No. 23-1106, 2025 U.S. Dist. LEXIS 211826 (D. Del. Oct. 27. 2025) ....................34

*Shopify Inc. v. Express Mobile, Inc.*,
No. 2024-1977, 2025 U.S. App. LEXIS 31917 (Fed. Cir. Dec. 8, 2025)................................24

*Silvergate Pharms., Inc. v. Bionpharma Inc.*,
No. CV 18-1962-LPS, 2021 WL 1751148 (D. Del. Apr. 29, 2021), *aff'd sub nom. Azurity Pharms., Inc. v. BionPharma Inc.*, No. 2021-1926, 2022 WL 703903 (Fed. Cir. Mar. 9, 2022) ..........................................................................50, 51

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013)..........................................................................45, 56

*Split Pivot, Inc. v. Trek Bicycle Corp.*,
987 F. Supp. 2d 838 (W.D. Wis. 2013), *aff'd*, 585 F. App'x 1011 (Fed. Cir. 2014) ..........................................................................................................50

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
987 F.3d 1358 (Fed. Cir. 2021)..........................................................................34

*Tactical Medical Solutions, Inc. v. Karl*,
2017 WL 4269003 (N.D. Ill. Sept. 26, 2017) ..........................................................16

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)..........................................................................25

*Teva Pharms. Int'l GMBH v. Eli Lilly & Co.*,
No. 18-CV-12029-ADB, 2021 WL 723337 (D. Mass. Feb. 24, 2021) ........................... *passim*

*Total Control Sports, Inc. v. Precision Impact*,
2019 WL 6464002 (N.D. Ill. 2019) .........................................................................16

*Traxxas, L.P. v. Hobbico, Inc.*,
No. 216CV00768JRGRSP, 2017 WL 4347709 (E.D. Tex. Sep. 29, 2017) .................... *passim*

*Vitronics Corp. v. Conceptronic*,
90 F.3d 1576 (Fed. Cir. 1996)......................................................................... *passim*

**Statutes**

35 U.S.C. § 112(a) ..........................................................................................46, 54

**Other Authorities**

LR 7.1.3(b)(2) ..........................................................................................................34

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| **Vilox** | Plaintiff Vilox AB |
| **Mohawk** | Defendants and Counterclaim-Plaintiffs Mohawk Industries, Inc.; Menard, Inc.; and Unilin BV together with Counterclaim-Plaintiffs Mohawk Carpet Distribution LLC and IVC US, LLC |
| **’717 Patent** | U.S. Patent No. 12,180,717 |
| **Feynman Lectures** | Reply Exhibit F – Richard Feynman, et al., *The Feynman Lectures on Physics, Volume II: Mainly Electromagnetism and Matter* § 38-1 (2010) |

* All quoted emphasis in this brief is added, unless otherwise indicated.

## I. REPRESENTATIVE CLAIMS

**Claim 1:**

A fold-down joining system for floor panels, comprising a fold-down female coupling formed in one piece with a first floor panel and a fold-down male coupling formed in a second floor panel, the fold-down female coupling comprising:

a female coupling recess being arranged on a female coupling tongue protruding away from a main portion of the first floor panel towards the adjoining second floor panel, the female coupling recess being adapted to receive a male coupling tongue projecting from the adjoining second floor panel in a direction away from a main floor surface plane in which the floor panels are laid, the fold-down female coupling further comprises an upper guiding surface being located on a side of the female coupling recess on the first floor panel forming a guide for the male coupling tongue upon insertion thereof, limiting movement of said male coupling tongue in a horizontal direction towards the main portion of the first floor panel;

the fold-down male coupling comprising:

the male coupling tongue formed in one piece in the second floor panel, the fold-down male coupling being provided with vertical locking means enabling a vertical interlocking engagement with a matching one piece vertical locking means of the fold-down female coupling, wherein

the female coupling tongue is resilient and comprises a distally arranged locking protrusion protruding from the female coupling tongue in a direction towards the main floor surface plane and being arranged to be received in a groove in the second floor panel for horizontal locking of the panels, wherein the locking protrusion is configured to come into contact with the male coupling tongue during joining of the first and second floor panels, the female coupling tongue further comprising a lower recess, enabling the locking protrusion of the female coupling tongue to be depressed during joining of the panels,

the fold-down joining system being configured for release by a coupling release tool or by pivoting the second floor panel in relation to the first floor panel, wherein the fold-down joining system further comprises:

a coupling release channel being arranged between the locking protrusion and an upper surface in the groove in the second floor panel, such that the coupling release tool is placeable in the coupling release channel for engaging the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means, or

an inclined abutment surface provided on the male coupling tongue for abutment with the locking protrusion of the female coupling tongue, or

an inclined abutment surface provided on the locking protrusion of the female coupling tongue for abutment against the male coupling tongue;

wherein the lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling tongue, or wherein the male coupling tongue has a protrusion length, measured from a bottom surface of the male coupling tongue to the upper surface of the groove in the second floor panel, of between 10% to 40% of a thickness of the second floor panel.

**Claim 10:**

The joining system for floor panels according to claim 1, wherein the male coupling tongue is rigid and nonresilient.

## II. AGREED-UPON CONSTRUCTIONS

| Claim Language | Agreed Construction |
|---|---|
| "main floor surface plane" (claims 1, 16, 20) | "the plane defined by the top surface of the floor panels as laid" |
| "the joint surface" (claim 8) | "the upper joint surface" |
| "the female coupling member" (claim 15) | "the female coupling tongue" |

## III. INTRODUCTION

### A. Plaintiff's Opening Position

Vilox, a Swedish R&D company, develops, patents and licenses innovative solutions for securely joining flooring and furniture components. Vilox's U.S. Patent No. 12,180,717, at issue here, discloses an improved joining system for flooring panels. This invention provides an interlocking profile that eases installation and disassembly of prefabricated flooring panels.

Prefabricated flooring panels are designed to snap into place, allowing for installation without the use of heavy machinery, messy glues, or expert help. These flooring panels tend to have either an angle-in joining profile or a fold-down joining profile. '717 Patent (Ex. A) at 1:30–35. The angle-in profile requires a tongue to be inserted into a groove, then angled down to lock the two panels together. The fold-down profile uses a "vertical snap-lock action which allows the joint to easily snap in place as the floor panels are folded down" next to one another. *Id.* at 1:40–43. Fold-down profiles sold before the '717 patent used stand-alone locking pieces, formed separately from the panels, to allow panels to engage with one another. *See id.* at 1:48–55. While these two approaches make flooring assembly easier, they can make removing or adjusting an installed floor panel difficult, often resulting in damage or destruction of the flooring panels.

The '717 patent discloses an innovative fold-down joining system capable of creating a

strong joint between a one-piece female coupling on one flooring panel and a one-piece male coupling on a second flooring panel that can be disassembled by pivoting the panels. *See id*. at 16:18–22; claim 1. The female coupling is designed to be more resilient than the male coupling, allowing the female coupling to bend around and engage with the male coupling to lock the panels into place. *Id.* at 10:60–11:4; 11:60–63. This system allows the installer to disengage the profile lock by either pivoting one panel upwards or pushing the female coupling downward, easing disassembly and adjustment. *Id.* at 15:25–31; 18:44–52; *see also id.* at 4:34–37. These improvements reduce cost, product waste, and installation effort.

The parties ask the Court to resolve two disputes about the construction of the ’717 claims:

*First*, whether the “rigid and nonresilient” male coupling tongue should be construed in isolation from the claims and the specification so that it must be “not flexible” and “unable to be deformed elastically.” Intrinsic evidence shows the claim language means that the male coupling tongue deflects comparatively less than the female coupling tongue, without requiring absolute inflexibility.

S*econd*, whether a set of claim limitations should be read as mutually exclusive despite the use of “comprising” and “or” in the claim. Construing this claim language as exclusive would read embodiments out of the claims, contravening well-established Federal Circuit precedent and the inventor’s clear intent. Defendants’ attempt to narrow the claims in this manner should be rejected.

**B. Defendants’ Answering Position**

Mohawk advances constructions that are consistent with the intrinsic and extrinsic records. Vilox does not. The Court should therefore adopt Mohawk’s proposed constructions.[1]

[1] To avoid repetition, Mohawk respectfully directs the Court to its Overview of the ’717 Patent contained in its Motion for Partial Summary Judgment of Indefiniteness.

### C. Plaintiff's Reply Position

There are two terms in dispute.

**For term 1**, Defendants ask the Court to ignore the patent specification and the physical realities of common flooring materials such as wood, fibreboard, and plastics to interpret a flooring panel's coupling tongue as a rock-solid immovable element that cannot bend. Defendants and Counterclaim Plaintiffs' Responsive Claim Construction Brief ("Resp."), 1-9. Because Defendants' construction conflicts with the intrinsic evidence and the laws of physics, it should be rejected.

**For term 2**, Defendants ask the Court to do what the '717 patent does not: rewrite open, inclusive claim language into a closed menu of mutually exclusive alternatives. Resp., 9-17. The term 2 dispute reduces to a single question: whether a set of structural features recited in claims 1 and 20 must be mutually exclusive despite the specification and figures' disclosures of the features coexisting in a single embodiment and the claims using the open-ended language. Because it would read out preferred embodiments and is not supported by the prosecution history, Defendants' limiting construction should be rejected.

### D. Defendants' Sur-Reply Position

Mohawk advances constructions that are consistent with the intrinsic and extrinsic records. Vilox does not. The Court should therefore adopt Mohawk's proposed constructions.

## IV. DISPUTED CONSTRUCTIONS

### A. TERM 1: "the male coupling tongue is rigid and nonresilient"

| Claim Term | Vilox's Construction | Defendants' Construction |
| --- | --- | --- |
| "the male coupling tongue is rigid and nonresilient"<br><br>'717 Patent (Ex. A) at claim 10. | "the male coupling tongue deflects comparatively less than the female coupling tongue during joining of the first and second floor panels" | "the male coupling tongue is not flexible, and unable to be deformed elastically" |

### 1. Plaintiff's Opening Position

The parties dispute whether an element reciting a male coupling tongue that is "rigid and nonresilient" should be read in comparison to the claimed female coupling tongue, or in absolute terms that would deny any elastic deformation. Intrinsic evidence, including the claims, specification, and prosecution history, shows that this language compares relative rigidity of the male and female coupling components—and does not require that the male coupling tongue be inflexible or incapable of any deformation.

#### a. The intrinsic evidence, including the '717 claims, specification, and prosecution history, confirms the male coupling tongue deflects comparatively less than the female coupling tongue

The claimed "male coupling tongue" being "rigid and nonresilient" is a relative comparison that does not preclude any elastic deformation. The '717 patent claims make clear that "the male coupling tongue is rigid and nonresilient" means the male coupling tongue deflects comparatively less than the female coupling tongue during joining of the first and second floor panels. Claim 1, from which claim 10 depends, recites a female coupling tongue that "is resilient." Claim 10 recites that the corresponding male coupling tongue is "nonresilient" and "rigid." Taken together, the ordinary artisan would understand this language to mean that the claimed male coupling tongue is "rigid" and "nonresilient" *compared to* the female coupling tongue.

The '717 specification consistently describes the male coupling tongue and female coupling tongue in comparative terms. For example, the specification describes female coupling tongue 32 as "more resilient than the male coupling tongue 40, such that the main resilience and movement is performed by the female coupling tongue 32." '717 Patent (Ex. A) at 11:58–64. In some embodiments, a recess "allows the female coupling tongue 32 to be depressed by interaction with the male coupling tongue 40 and to resiliently snap back into place." *Id.* at 16:40–45. As

another example, female coupling tongue 32 may "be made out of a material having a lower elastic modulus than the material of the male coupling, facilitating that the elastic deformation is performed by the female coupling and not by the male coupling." *Id.* at 13:15–20. Thus, the specification—the "single best guide to the meaning of a disputed term," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*)—confirms that "rigid" and "non-resilient" are comparative terms, used to compare the female and male coupling tongues.

As these examples from the specification illustrate, the female coupling tongue is configured to bend before the male coupling tongue. The female coupling tongue 31 elastically depresses downward, providing space for the protrusion of the male coupling tongue 40 to seat within lower recess 33. *See* '717 Patent (Ex. A) at 10:60–67. After the male coupling tongue 40 is in place, the female coupling tongue 32 elastically returns to lock into the groove 70 of the male coupling tongue 40, reaching its horizontal locking position. *Id.* at 10:67–11:4. Figures 2–4 show this locking engagement step-by-step. *See, e.g.*, *id.* at Figs. 2–4, 9:14–12:19.




’717 Patent (Ex. A) at Figs. 2–4.

This process requires the female coupling tongue to elastically deform before the male coupling tongue. *Id.* at 10:8–11, 10:60–63 (“The female coupling tongue 32 will need to be depressed, pushed downwards, temporarily (as shown in FIG. 3) for the male coupling tongue 40 to be able to reach its locked position”).

The specification discloses that the relative elasticity of the male and female coupling tongues distinguishes previous fold-down locking profiles, which introduced slots into male joint elements to make them more flexible. *Id.* at 8:44–52. Adding these slots “cause[d] a structural

weakness in the joint," detracting from overall performance. *Id.* The '717 patent discloses embodiments with no elasticity slots in the male coupling tongues. *See e.g.*, *id*. at Figs. 2–4. Again, this geometry ensures "the female coupling tongue 32 [is] *more resilient than* the male coupling tongue 40, such that the main resilience and movement is performed by the female coupling tongue 32." *Id*. at 11:60–63 (emphasis added). In other words, the claim terms "rigid and nonresilient" refer to the characteristics of the male coupling tongue *relative to* the female coupling tongue during installation. In fact, the male coupling tongue likely also slightly flexes during installation. *Id*. at 11:61–63 ("the *main* resilience and movement is performed by the female coupling tongue 32") (emphasis added).

The '717 patent specification also confirms that the comparative relationship between the male and female coupling tongues should be assessed during joining of the claimed first and second floor panels, as in Vilox's proposed construction. During joining, at least a portion of the female coupling tongue can "elastically bend to accommodate the male coupling tongue 40." *Id*. at 10:65–67. After the two panels are joined, the female coupling tongue elastically returns from its depressed position. *See id.* at 10:67–11:4. Because the relative resilience of the female and male coupling tongues is relevant to the joining of floor panels, this is when the ordinary artisan would assess the "rigid" and "nonresilient" claim terms. *See Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1377–79 (Fed. Cir. 2009) (affirming construction that the "relatively resilient" claim term had to permit the deflection and snap-back only during manufacture, not in the finished product as argued by accused infringer).

The '717 patent prosecution history confirms the importance of the relative rigidity of the female coupling tongue and the male coupling tongue. During prosecution, Applicant explained that claim elements relating to the thickness and protrusion length of the male coupling tongue led

to a "rigid and non-resilient" tongue. *See* Ex. B at 12–13 (Reply to Non-Final Office Action (Oct. 17, 2024)). As in the specification and claims, the Applicant compared the rigidity of the female and male coupling components, stating that "'the female coupling tongue is resilient,' rather than the male coupling tongue." *Id*. at 13. And confirmed that this arrangement led to greater overall rigidity of the resulting joint. *Id*. at 12–13. These statements make no "clear and unmistakable disavowal" of the term "rigid," as would be required for the patent prosecution to countermand clear statements in the specification. *See Tactical Medical Solutions, Inc. v. Karl*, 2017 WL 4269003, *5–*7 (N.D. Ill. Sept. 26, 2017) (finding that the patent challenger failed to show that the prosecution history supported its contention that the claim term "substantially rigid" meant having no flexibility in view of the specification's contrary teachings).

There being no conflict between the claim language, specification, and prosecution history, the court need not review extrinsic evidence to construe the claim term. *See Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583–86 (Fed. Cir. 1996) (remanding a case in which the district court relied on extrinsic evidence where the claims, read in light of the intrinsic evidence, did not contain "genuine ambiguity").

**b. Mohawk's proposed construction is incorrect because it would require no deformation of the male coupling tongue, conflicting with intrinsic evidence and plain meaning of the claims**

Mohawk's proposed construction, which requires that the male coupling tongue is "unable to be deformed elastically," improperly ignores physical reality and conflicts with the '717 intrinsic evidence. The specification provides necessary context for construing terms that might otherwise appear to be absolute. In *Total Control Sports*, for example, the court refused to take an absolutist construction to the term "unburstable," in the context of a weighted ball meant to be hit with a bat. *Total Control Sports, Inc. v. Precision Impact*, 2019 WL 6464002, *6–*7 (N.D. Ill.

2019). Rather, the court considered physical realities and the context of the specification, which explained that the weighted ball was "strong enough to withstand multiple batting strikes thus giving the ball longevity" and thus construed "unburstable" to mean "strong enough to withstand multiple batting strikes." *Id.*; *see also Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1088 (Fed. Cir. 2009) (explaining that the claimed "real-time" transmission of data between devices could not "possibly mean displaying data literally instantaneously, because the claims themselves require a transmission that necessarily takes some time, however minute that might be"). Similarly, in *Power Integrations*, the Federal Circuit overturned a district court's grant of judgment as a matter of law, which relied on an absolutist application of a claim construction that "would impermissibly render the claims inoperable." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 972 (Fed. Cir. 2018) (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1345 (Fed. Cir. 2009)) The court explained that while the claims directed to electronic devices with a "fixed switching frequency" were construed to mean "non-varying number of switching cycles per second," the jury was free to consider the physical realities that "no real-world power supply controllers could operate with an absolutely fixed, or non-varying, frequency" when finding infringement. *Id.*

Here, the specification shows that Mohawk's proposed claim construction cannot be correct. The specification discloses that the male and female locking profiles can be "entirely formed in the main substrate of the floor panel." '717 Patent (Ex. A) at 9:28–29. And may be made of the same material. *See id.* This flooring material may be "for example solid wood, laminated wood, different types of fibreboard materials like MDF or HDF materials, plastic or composite polymer materials like PVC or LVT or other polymer materials and metals such as aluminium[sic]." *Id.* at 22:23–27. Because these materials will exhibit some elasticity, it is

understood that each component of the joining system would have at least *some* give to them. *See id.* at 10:65–11:4. Indeed, the specification advises its readers to "avoid . . . brittle materials." *Id.* at 8:39–43. Because Mohawk's construction conflicts with these preferred embodiments, it should be rejected. *See, e.g.*, *Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1377, (Fed. Cir. 2005) (district court properly rejected accused infringer's proposed construction of the claim limitation "dust-free" and "non-dusting" as meaning no dust whatsoever because that construction would read out a preferred embodiment).

The Federal Circuit has held that the term "rigid" must be taken in context of the teachings of the specification. For example, in *Bionx Implants*, the court affirmed the district court's construction of a surgical suture having a "rigid" shaft to mean was rigid enough "to be pushed directly through the semi-hard cartilage of a meniscus without any precutting." *Bionx Implants, Inc. v. Linvatec Corp.*, 299 F.3d 1378, 1380–82 (Fed. Cir. 2002) (vacating and remanding on other grounds). Courts have also declined to render the term "rigid" as indefinite where a person of ordinary skill in the art would understand, from the context of the specification, how rigid was "rigid enough" for the invention to function. *See Copan Italia S.p.A. v. Puritan Medical Products Company LLC*, 2019 WL 5699078, *8 (D. Me. 2019).

**2. Defendants' Responsive Position**

**a. The intrinsic record supports that the male coupling tongue is not flexible and unable to be deformed elastically.**

Mohawk's proposed construction "the male coupling tongue is not flexible and unable to be deformed elastically" sets forth the plain meaning of "rigid" and "non-resilient." This construction is supported by the intrinsic record because (1) the claims clearly distinguish the male coupling as rigid and non-resilient, whereas the female coupling is described as flexible and resilient; (2) the '717 Patent proposes to solve problems in the prior art resulting from the flexibility

of the "male joint elements;" (3) the specification consistently describes the female coupling tongue as flexible, rather than the male coupling tongue; and (4) during prosecution, the applicant further distinguished the "invention" of the '717 Patent from the prior art by pointing to the rigid and non-resilient male coupling tongue.

***First,*** the clear claim language supports Mohawk's construction. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006). Specifically, the claims clearly distinguish between the female coupling tongue and the male coupling tongue. The female coupling tongue is consistently described as "resilient." *See* '717 Patent at cls. 1 ("the female coupling tongue is resilient"), 16 (same), 17 (same), 20 (same). On the other hand, claim 10 expressly describes the male coupling tongue as "non-resilient." *See* '717 Patent at cl. 10. The claim term speaks for itself and is clear that the male coupling tongue is rigid and non-resilient, whereas the female coupling tongue "is resilient," as described in independent claim 1 from which claim 10 depends. The claims further describe that the female coupling tongue may be depressed, or bent, to release the locking. *See, e.g.,* '717 Patent at cl. 1 ("the coupling release tool is placeable in the coupling release channel for engaging the female coupling tongue, to ***depress*** the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means."). The claims offer no similar description of the male coupling tongue.

***Second,*** the specification of the '717 Patent confirms that the male coupling tongue is not flexible and unable to be deformed elastically. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The '717 Patent expressly aims to solve an alleged problem in the prior art resulting from flexible male coupling

parts:

> Usually, fold down joining systems with elasticity slots ***rely on male joint elements that are flexible at least partly by the provision of the elasticity slot*** such that the [sic] can elastically bend during joining of the panels in order to be able to be accommodated by a corresponding female join [sic] element. The elasticity slot will however ***cause a structural weakness in the joint which in some embodiment [sic] may be undesired.*** Furthermore, it is beneficial to be able to release the joint in case of if a panel is damaged or incorrectly placed.

’717 Patent at 8:44-52. Thus, the specification discloses that the flexibility of male joint elements may cause structural weaknesses in the joint in prior art embodiments which may be undesirable. To solve this problem, the ’717 Patent describes a non-resilient male coupling tongue. *Id.* at 8:53-56 (“the object of the present invention [is] to provide a system for joining floor panels which allows a secure and easy joining of floor panels, which provides ***an improvement of the structural rigidity of the joint*** and which is releasable”).

Indeed, the summary of the invention the ’717 Patent provides, “[t]hereby a joining system provided which, by the provision of the resilient female coupling tongue, ***removes the need for a resilient male coupling tongue***.” ’717 Patent at 2:54-60. In a later embodiment, it further describes that “[t]he female coupling tongue 32 may instead or additionally be made out of a material having a lower elastic modulus than the material of the male coupling, facilitating that the ***elastic deformation is performed by the female coupling and not by the male coupling***.” ’717 Patent at 13:15-20.

***Third,*** the specification repeatedly states that it is the ***female*** coupling that is able to bend elastically, not the ***male*** coupling. *See, e.g.,* ’717 Patent at 10:63-67 (“This is enabled as the female coupling tongue 32 comprises the lower recess 33, which allows at least the portion of the female coupling tongue 32 with the locking protrusion 31 to elastically bend to accommodate the male coupling tongue 40.”); 10:6-11; 10:23-28; 10:67-11:4; 13:9-12; 16:51-55; 20:39-47. In fact, in some embodiments the male coupling tongue “will resiliently depress/deflect the female coupling

tongue 32 during insertion until the two panels 10, 20 are joined together." *See* '717 Patent at 19:32-38; *see also* 10:8-11, Fig. 3. Therefore, these patent disclosures make clear that the '717 Patent's improvement over the prior art is directed to the lack of resiliency in the male coupling part. The female coupling part is consistently described as deflecting, deforming, bending, and as resilient whereas it is silent as to these characteristics for the male coupling tongue.

***Fourth,*** the prosecution history supports Mohawk's construction. *See Phillips*, 415 F.3d at 1317 ("Like the specification, the prosecution history provides evidence of how the [patent office] and the inventor understood the patent."). During prosecution, the applicant references the section of the later-issued '717 Patent specification ('717 Patent at 8:44-52), excerpted above, to distinguish the flexibility of the male coupling parts in the prior art. *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021) ("[E]ven in the absence of a clear and unmistakable disavowal, . . . the prosecution history can be evaluated to determine how a person of ordinary skill would understand a given term.") (quoting *Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718 F. App'x 965, 971 (Fed. Cir. 2018)). The applicant also referenced a separately pending application by the same applicant which "provides an example of on [sic] a fold down joining system with a flexible *male* coupling tongue and an elasticity slot." Ex. C ('717 Patent Prosecution History) at VILOX001085 (emphasis in the original). The applicant then expressly stated "the present application differs in that the resiliency in the joint is such that 'the female coupling tongue is resilient,' rather than the male coupling tongue." *Id.* The applicant also provided that "to improve structural rigidity of the joint, the claims in present application recite that the thickness of the male coupling tongue is 'between 10% and 40% of [the] thickness of the [] floor panel,' so that the male coupling tongue is rigid and non-resilient." *Id.* And the applicant alleged that "the criticality of the claimed protrusion length of the male coupling tongue is clearly present in the specification ***and***

***distinguishes the present claimed joint from the cited references***." *Id.* The applicant thus connected this measurement of the length of the male coupling tongue to the structural rigidity of the joint and the non-resilient nature of the male coupling tongue, and further distinguished these features from the prior art. *See id.* The examiner allowed the claims based on applicant's statements emphasizing the rigidity of the male coupling tongue to distinguish the prior art. *Id.* at VILOX001168 (Notice of Allowance) ("the prior art of record does not provide a teaching, suggestion or motivation for the combination specifically including … wherein the male coupling tongue has a protrusion length, measured from a bottom surface of the male coupling tongue to the upper surface of the groove in the second floor panel of between 10% to 40% of the thickness of the second floor panel.").

As such, Mohawk's proposed construction, setting forth the plain meaning of "rigid" and "non-resilient," is supported by the entire intrinsic record. The prosecution history and specification of the '717 Patent consistently describe the male coupling tongue as being non-resilient and rigid, not having the ability to bend or deform. The alleged inventive concept of the '717 Patent is moving the elasticity from the male coupling tongue (as in the prior art) to the female coupling tongue. *Compare* '717 Patent at 8:44-52 (describing the flexible male coupling parts in the prior art) *with* '717 Patent at 13:15-20 (describing one embodiment of the '717 Patent and providing that the "the elastic deformation is performed by the female coupling and not by the male coupling."); *see also* Ex. C ('717 Patent Prosecution History) at VILOX001085-86. Both the specification and the prosecution history further distinguish the male coupling part of the '717 Patent to that of the prior art which in contrast allegedly did bend and deform. *See* '717 Patent at 8:44-52; Ex. C ('717 Patent Prosecution History) at VILOX001085-86. The examiner ultimately allowed the claims in part due to this distinction. It would be improper now to adopt an alternative

meaning.

#### b. Vilox's Proposed Construction Ignores The Express Claim Language And Misinterprets The Intrinsic Record.

The express language of the claims specifically characterizes the male coupling tongue as both rigid and non-resilient. Those terms are not relative, nor are the claim requirements dependent on a comparison of the relative resiliencies of the male and female coupling tongues respectively. Vilox's proposed construction must therefore be rejected absent a clear disclaimer or lexicography that departs from the plain meaning of the claim language. *See, e.g., Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014). No such disclaimer or lexicography exists here.

Vilox offers only two pieces of evidence in support of its proposed redrafting of the claim language: (1) the understanding of "the ordinary artisan" and (2) a singular specification citation providing a "comparison" between the resiliency of the female coupling tongue as compared to the male coupling tongue. Vilox's threadbare support provides no basis for ignoring the express claim language and its proposed construction should therefore be rejected.

First, Vilox suggests, without any support, that an ordinary artisan would understand that the limits placed solely on the male coupling tongue should be measured exclusively through comparison with the female coupling tongue. *See* Op. Br. at 7, s*upra* Part III.A at 11 ("the ordinary artisan would understand this language to mean that the claimed male coupling tongue is 'rigid' and 'nonresilient' *compared to* the female coupling tongue"); 10, *supra* Part III.A at 14 ("Because the relative resilience of the female and male coupling tongues is relevant to the joining of floor panels, this is when the ordinary artisan would assess the 'rigid' and 'nonresilient' claim terms."). But extrinsic evidence should not be relied on where, as here, the intrinsic evidence provides ample guidance to a term's meaning. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996). Indeed, Vilox offers no expert testimony or other extrinsic evidence to support

its alleged "ordinary artisan" understanding, nor does it provide a definition of the level of ordinary skill it seeks to apply. For these reasons, Vilox's arguments related to "an ordinary artisan" must be discredited as conclusory remarks without supporting evidence. *See Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376-77 (Fed. Cir. 2022) ("To offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, invalidity, or infringement—a witness must at least have ordinary skill in the art."). This also amounts to bare attorney argument that should be similarly given no weight. *See Shopify Inc. v. Express Mobile, Inc.*, No. 2024-1977, 2025 U.S. App. LEXIS 31917, at *15 (Fed. Cir. Dec. 8, 2025) (holding that "[t]he verdict cannot rest on a new infringement theory—not supported by testimony—that was raised for the first time in closing argument" as attorney argument is not evidence).

Second, Vilox's reliance on a single sentence in the specification does not warrant altering the express language of the claims. The sentence on which Vilox relies states that "[t]he horizontal width J as well as the vertical thickness P are both wider than the thickness E making the female coupling tongue 32 more resilient than the male coupling tongue 40, such that the main resilience and movement is performed by the female coupling tongue 32." '717 Patent at 11:58-63 (cited by Vilox Op. Br. at 7, 10, *supra* Part III.A at 11, 15). That sentence does not alter the plain meaning of the terms "rigid" or "resilient." At most, the sentence describes that the female couple tongue is more resilient than the male coupling tongue, which remains true under the claim language which requires the male coupling tongue to be rigid and non-resilient. Moreover, the remaining specification citations relied on by Vilox all relate to the flexibility and resiliency of the female coupling tongue, and none of these disclosures draw any comparison between the female coupling tongue and the male coupling tongue. *See* Op. Br. at 7-11, *supra* Part III.A at 11-15. In fact, Vilox

relies on many of the same specification citations and the same prosecution statements described above that support Mohawk's construction, and attempts to ***read in*** a relative comparison that is only a passing reference in the specification contrary to the clear language in the claims, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1320-21, 1323 (While claims may be understood in light of the specification, courts should "avoid importing limitations from the specification into the claims," which is a "cardinal sin" of patent law). At best, this comparison relates to one of many preferred embodiments described in the patent (*see* '717 Patent at 11:44-47) and should likewise not be read into the claims. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002) ("We have cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.") (citation modified). Vilox's arguments would effectively eliminate the clear claim requirement that the male coupling tongue is "rigid and non-resilient," which is improper. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021).

Moreover, in no other place in the intrinsic record is any express comparison drawn between the resiliency of the male and female coupling part. Instead, the specification and prosecution history consistently describe the male coupling tongue as rigid as compared with the prior art male coupling parts that are resilient. *See* '717 Patent at 2:43-57 ("Thereby is a joining system provided which, by the provision of the resilient female coupling tongue, removes the need for a resilient male coupling tongue."); 8:44-52 (describing alleged problems with flexible male joint elements in the prior art). For these reasons, Vilox misinterprets the specification and prosecution history distinguishing the invention of the '717 Patent from the prior art as it contained a non-resilient male coupling tongue. *See* Op. Br. at 10-11, *supra* Part III.A at 14-15.

Vilox's construction also improperly attempts to read in a "during joining" condition to the

claim. This requirement is nowhere in the claim language. The limitation at issue simply describes the characteristic of the male coupling tongue—namely, that it is "rigid and non-resilient." Adding a condition that the non-resilient characteristic of the male coupling must be analyzed "during joining" adds unwarranted complexity to what is otherwise a straightforward claim term. Tellingly, Vilox provides no intrinsic, or extrinsic support, for this addition.

Finally, Vilox's complaints that Mohawk's proposed construction improperly reads in an "absolute" into the claim terms are misplaced. *See* Op. Br. at 11-13, *supra* Part III. A at 15-17. The terms must be read in view of the intrinsic record. *See, e.g., Phillips*, 415 F.3d at 1315-17. When the applicant distinguished the male coupling tongue of the '717 Patent from that of the prior art both in the specification and the prosecution history, it defined the scope of the claimed invention. The male coupling tongue of the '717 Patent is clearly intended to be rigid and non-resilient, unable to be deformed elastically, as compared with the male coupling tongues of the prior art that were flexible. 8:44-52; Ex. C ('717 Patent Prosecution History) at VILOX001085-86. The '717 Patent proposes that its alleged invention moves the flexibility from the male coupling part to the female coupling part, distinguishing it from the prior art in order to obtain patent protection. *See* Ex. C ('717 Patent Prosecution History) at VILOX001085-86. Vilox should not be now allowed to reclaim that claim scope. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.").

For all of these reasons, Mohawk respectfully requests that its claim construction be adopted.

**3. Plaintiff's Reply Position**

Defendants' proposed construction, which requires a male coupling tongue that is "unable to be deformed elastically," violates the laws of physics. Seeking to support this physical impossibility, Defendants overlook claim language, misread or ignore the specification, misread the prosecution history, and disregard relevant caselaw. Vilox requests that the Court adopt its proposed construction—which calls for a male coupling tongue that deflects comparatively less than the female coupling tongue during joining of the first and second floor panels—as the only one that conforms to the patent laws of the United States and the physical laws of the universe.

**a. Defendants' Construction Violates the Laws of Physics**

Defendants' construction of claim 10 is fatally flawed because it would require the claim to recite a physical impossibility—a component "unable to be deformed elastically." The '717 patent specification expects the male and female coupling tongues to consist of materials that have *some* degree of elasticity when it refers to an embodiment in which the female coupling tongue's material has "a lower elastic modulus [(a measure of a material's ability to elastically bend or stretch)] than the material of the male coupling." '717 Patent (Ex. A) at 13:15-18. In this way, the specification recognizes the physical reality that all solid substances are capable of some degree of elastic deformation. *See, e.g.*, Ex. F (Richard Feynman, et al., *The Feynman Lectures on Physics, Volume II: Mainly Electromagnetism and Matter* § 38-1 (2010)) ("We find this elastic property to some extent in all solid bodies."); *see id.* at § 38.3. By proposing a construction that would require the male coupling tongue to be "unable to be deformed elastically," Defendants would cause the claim to recite an impossible-to-manufacture component. Because this construction would require a physical impossibility it "should be viewed with extreme skepticism." *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1278 (Fed. Cir. 2011) (citation omitted).

Vilox's opening brief identified this fundamental flaw, citing extensive caselaw

demonstrating why such a construction should fail. Plaintiff's Opening Claim Construction Brief ("Open."), 11-13, *supra* Part IV.A.1.b, at 16-18. Defendants do not even attempt to distinguish this precedent. And rather than explain why their proposed construction does not claim a physical impossibility, Defendants embrace that their construction requires an "absolute" understanding of "rigid and nonresilient," claiming support from "the intrinsic record." Resp., 8-9,*supra* Part IV.A.2.b, at 24–25. But, as demonstrated below, Defendants ignore claim language and misread the specification and file history.

#### b. Intrinsic Evidence, Including the Claims and Specification, Conflicts with Defendants' Construction

Defendants err by construing claim 10's language in a vacuum. Claim 1, from which claim 10 depends, recites a "fold-down joining system for floor panels" with male and female coupling tongues. '717 Patent at Cl. 1. Floor panels are not made of inelastic materials. Indeed, the '717 specification gives several examples of possible materials such as "wood or a wood-based material such as MDF or HDF, or a main substrate made of SPC (Stone Plastic Composite) or, plastic or composite polymer materials like PVC or LVT or other polymer materials and metals such as aluminium." *Id.* at 8:65-9:4. None of these are inelastic. This context mandates a relative, not absolute, understanding of "resilient" and "rigid and non-resilient."

Defendants' contention that the claims "distinguish between the female coupling tongue and the male coupling tongue" (Resp. 2, *supra* Part IV.A.2.a, at 18–19) does not require the male tongue to be incapable of elastic deformation. At most, the claims indicate the two coupling tongues behave differently. Claim 1 says the female coupling tongue is resilient, deflecting during joining by virtue of the claimed "lower recess." The male coupling tongue of claim 10, in contrast, does not deflect during joining. But this is a far cry from Defendants' construction, which adds limitations requiring absolute rigidity, leaving the male coupling tongue so inflexible it is "***unable***

***to be deformed elastically*.”

Defendants’ reading is at sharp odds with the specification. First, the specification describes the female coupling tongue as “***more resilient*** than the male coupling tongue . . ., such that the ***main resilience and movement*** is performed by the female coupling tongue.” ’717 Patent at 11:48-63.[2] Defendants attempt to reconcile this with their construction by saying that it is “true” even under their extreme construction, presumably because ***some*** resilience is “more” than ***no*** resilience. Resp., 7, *supra* Part IV.A.2.b, at 23. But when the specification describes the female as “more resilient” than the male, it implies the male may have *some* degree of resilience (even if small). And the specification’s description of the female tongue providing the “main resilience and movement” makes no sense if the female tongue provides *all* resilience and movement. And, of course, physics demands that the male coupling tongue have *some* modulus of elasticity, so Defendants’ attempt to reconcile this with their construction cannot be correct.

Contrary to Defendants’ protestations, Vilox’s construction does not read limitations into the claims. Resp., 7-8, *supra* Part IV.A.2.b, at 23–24. Claim 1 makes clear that the female coupling tongue is “resilient” and has a locking protrusion configured “to come into contact with the male coupling tongue during joining” and “to be depressed during joining.” Claim 10 states the male coupling tongue with which the locking protrusion interacts is “rigid and non-resilient.” Thus claim 10 compares the relative resiliency of the female and male coupling tongues, which will be apparent when the first and second floor panels are joined: during joining the male coupling tongue will be “rigid” and the female coupling tongue will “be depressed.” Taken together, the language of claims 1 and 10 confirms (1) that the male coupling tongue deflects comparatively less than the female coupling tongue and (2) that this relative resiliency is to be assessed during joining of the

[2] Unless otherwise noted, all emphasis is added.

first and second floor panels.

Defendants also misread the specification. They contend Vilox relies on "a single sentence in the specification" and that "in no other place in the intrinsic record is any express comparison drawn between the resiliency of the male and female coupling part." Resp., 7-8, *supra* Part IV.A.2.b, at 23–24; *see id.* at 6, *supra* Part IV.A.2.b, at 22–23. But this ignores the multiple, interrelated teachings from the '717 patent that were expressly cited in Vilox's opening argument. *See* Open., 7-9, *supra* Part IV.A.1.a, at 11–14 (citing '717 Patent at 11:58-64 (female tongue "more resilient" than male tongue); 13:15-20 (female coupling tongue may be made of a material having a lower elastic modulus than the material of the male coupling); 10:8-11 (female coupling tongue is temporarily depressed during insertion of male coupling tongue); 10:60-67 (similar); 16:40-45 (similar); Figs. 2-4 (illustrating relative movement of male and female tongues)). Thus, the specification—the "single best guide to the meaning of a disputed term," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (citation omitted)—discloses male coupling tongues that are "rigid" and "non-resilient" compared to the female coupling tongue.

Defendants also err in contending that "the specification discloses that the flexibility of male joint elements may cause structural weaknesses in the joint in prior art embodiments." Resp., 2, *supra* Part IV.A.2.a, at 19. The portion of the specification to which Defendants point does not distinguish "the flexibility of male joint elements" but, rather, the use of "elasticity slots." '717 Patent at 8:37-50. The specification unambiguously says an "elasticity slot"—not "the flexibility of male joint elements"—"will . . . cause a structural weakness." *Id.* Despite noting that elasticity slots are "[u]sually" found in male joint elements, the specification nowhere limits its criticism of elasticity slots to male joint elements. This portion of the specification does not support Defendants' construction.

#### c. Defendants Misread the Prosecution History

When addressing the ’717 prosecution history, Defendants persist in misreading the specification. Defendants contend the specification was used “to distinguish the flexibility of the male coupling parts in the prior art.” Resp., 4, *supra* Part IV.A.2.a, at 20–21. Not so. The applicant referenced the specification to distinguish “elasticity slots or grooves” not “the flexibility of the male coupling parts.” Ex. B at 12-13. As Vilox explained, eliminating elasticity slots allows for improved “structural rigidity of the joint,” an assembly of male and female coupling tongues. *Id.* at 13. This improved joint rigidity does not require the male coupling tongue to be “not flexible” or “unable to be deformed elastically.”

The prosecution history cited by Defendants does not address the disputed “rigid and nonresilient” phrase of claim 10. Rather, it relates to claim 1, which recites a male coupling tongue being “between 10% and 40% of a thickness of the second floor panel.” Ex. B at 12-13. Vilox pointed to “the ***criticality of the claimed protrusion length”*** as distinguishing ***“the present claimed joint from the cited references***.” *Id*. Because these statements address the protrusion recited in claim 1, they do not limit claim 10’s “rigid and nonresilient” phrase. *See AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021) (explaining the prosecution history’s relevance to understanding of claim terms).

Further, Vilox’s statement that the “‘female coupling tongue is resilient’ rather than the male coupling tongue” confirms these components’ resilience is relative. This is consistent with the specification, which discloses embodiments where the female tongue is more resilient than the male coupling tongue. ’717 Patent at 11:58-64. And female tongues that will be depressed during joining. *Id*. at 10:8-11. That the female coupling tongue is relatively more resilient than the male coupling tongue does not support reading Defendants’ absolutist “unable to be deformed” limitation into claim 10.

Defendants' arguments attempt to put words in Vilox's mouth. Resp., 9. But neither the prosecution history nor the patent says all flexibility "moves … from the male coupling part to the female coupling part" or that the male coupling tongue is "unable to be deformed elastically." While the prosecution history confirms the criticality of the length of the protrusion of claim 1, it does not disavow ***all*** elastic deformation of the male coupling tongue of claim 10. Ex. B at 13. This is especially so given that the specification repeatedly references elastic deformation in the male coupling part. *See, e.g.*, '717 Patent at 11:48-63 (implying some degree of resilience and movement in the male coupling part), 13:15-20 (recognizing the basic physical reality that the male coupling part has an "elastic modulus"). Defendants' argument "Vilox should not be allowed to reclaim . . . claim scope" accordingly lacks merit.

**d. Defendants Wrongly Suggest that Vilox Cited Extrinsic Evidence**

Defendants wrongly criticize Vilox for addressing the "understanding of 'the ordinary artisan.'" Resp., 6, *supra* Part IV.A.2.b, at 22. Claims are to be interpreted as they would be understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313. Vilox did not submit "extrinsic evidence" in referencing this legal standard. Indeed, Vilox expressly stated that "[t]here being no conflict between the claim language, specification, and prosecution history," there is no need to "review extrinsic evidence to construe the claim term." Open., 11, *supra* Part IV.A.1.a, at 15.

Defendants suggest that because "Vilox offers no expert testimony or other extrinsic evidence," its statements are "attorney argument that should be . . . given no weight." Resp., 6-7, *supra* Part IV.A.2.b, at 22–23. This is a puzzling suggestion, as Defendants similarly offer no "expert testimony or other extrinsic evidence," yet also refer to "what a person of ordinary skill would understand." Resp., 13, *infra* Part IV.B.2.a, at 46; *see also id.* ("a person of ordinary skill

examining this file history and specification would read this amendment . . ."); *id.* at 14, *infra* Part IV.B.2.a, at 46–47 ("A person of ordinary skill reading the prosecution history would understand . . .").

**4. Defendants' Sur-Reply Position**

Vilox (1) misreads Defendants' construction to fabricate a dispute, (2) improperly introduces extrinsic evidence in Reply, and (3) mischaracterizes the intrinsic record.

*First*, Vilox's misreads Defendants' construction to require a physical impossibility. *See* Reply at 6 (citing Feynman Lectures at 38-1). Defendants agree that, of course, every material on earth has some degree of elasticity. But Vilox ignores that a POSITA would understand the construction in view of the intrinsic record and technical field, not as an impossible absolute.

A POSITA would understand "not flexible and unable to be deformed elastically" within the context of floor locking technology and the '717 Patent. Specifically, a "rigid and non-resilient" male coupling tongue is required to be sufficiently stiff, by virtue of its material properties, geometry, or both, such that it is not capable of functioning as a resilient spring member through substantial deformation and subsequent elastic recovery. The construction does not require the impossible proposition that the tongue exhibits zero measurable elastic strain under every conceivable load. A POSITA would recognize that different coupling members may exhibit vastly different capacities for deformation and subsequent elastic recovery. *See, e.g.,* '717 Patent, 10:23-26 ("Having a longer width L makes it easier to make the female coupling tongue 32 sufficiently resilient without the need of a very elastic material."). Materials commonly used for rigid floor panel coupling tongues, like those that are wood-based, HDF, MDF, metals, and PVC, have varying degrees of elasticity, with plasticized PVC having a higher degree of elasticity. *See* '717 Patent, 1:56-64; 8:65-9:8; 22:22-29. Thus, a POSITA would understand that some coupling members can be sufficiently stiff such that they do not function as resilient spring members. *See*

Feynman Lectures at 38.1. Defendants' construction provides the necessary context to make this distinction in view of the specification. *See* '717 Patent, 13:15-20 ("The female coupling tongue 32 may instead or additionally be made out of a material having a lower elastic modulus than the material of the male coupling, facilitating that the elastic deformation is performed by the female coupling ***and not*** by the male coupling."); 3:41-42 ("In one embodiment, the male coupling tongue ***is rigid and non-resilient***."). Thus, while understanding that all materials have some degree of elasticity, the POSITA would consider a coupling tongue to be "rigid and non-resilient" when it cannot undergo the substantial deformation and subsequent elastic recovery characteristic of a resilient locking element.

Further, under its theory, Vilox tacitly admits that Claim 10—containing no relative descriptors at all—describes a product that contradicts the laws of physics, rendering the claim indefinite. *See Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366-67 (Fed. Cir. 2021) (holding the asserted claims indefinite where they were "nonsensical and require an impossibility."); *see also Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*, No. 18-313-CFC, 2021 U.S. Dist. LEXIS 53267, at *4-6 (D. Del. Mar. 22, 2021).

*Second*, Vilox creates this illusory dispute through extrinsic evidence undisclosed at the extrinsic evidence deadline and improperly introduced in Reply, not in response to anything new raised by Defendants. *See* D. Del. LR 7.1.3(b)(2); Ex. D (Vilox AB's Preliminary Claim Constructions and Extrinsic Evidence). Vilox fails to point to any ambiguity in the intrinsic record which necessitates turning to extrinsic evidence. The Feynman Lectures should thus be given no weight. *See Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Rally AG LLC v. Apple Inc.*, No. 23-1106, 2025 U.S. Dist. LEXIS 211826, at *22 (D. Del. Oct. 27. 2025).

*Third*, Vilox misinterprets the intrinsic record. Vilox's proposed construction attempts to completely read out the terms "rigid and non-resilient" from the claim and introduce a term of degree by comparison between the male and female coupling. With no lexicography or disavowal, the term is given its plain and ordinary meaning as understood by a POSITA. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022); *see* '717 Patent, 3:41-42. A POSITA would understand this term within the context of the technical field and specification, as described above. The specification consistently describes the female coupling tongue as resilient whereas the male coupling tongue is not resilient, allowing the male coupling tongue to push down and depress the female coupling tongue. *See, e.g.,* '717 Patent, 19:36-38; 10:23-26; 16:40-45.

Vilox creates ambiguity through a moving target of "non-resiliency." *See 10x Genomics, Inc. v. Parse Biosciences, Inc.*, No. 22-1117, 2024 U.S. Dist. LEXIS 81505, at *24-26 (D. Del. May 3, 2024) (rejecting plaintiffs' construction which "would inject ambiguity and subjective intent to the claim."). Vilox attempts to make "non-resilient" dependent on the resiliency of a different claim element (the female coupling tongue) rather than on the properties and configuration of the male coupling tongue itself. The fact that all solid materials exhibit some degree of elastic deformation does not justify rewriting "non-resilient" in this way, undefined by any objective boundaries anywhere in the intrinsic record. The proposed construction leaves open to what extent the male coupling tongue deflects comparatively less than the female coupling tongue. The male coupling tongue must be sufficiently non-resilient so as to force the deformation of the female coupling tongue. *See, e.g.,* '717 Patent, 10:8-11. Vilox's proposed construction, however, would allow deformation of the male coupling tongue as long as the amount of deformation is less than the female coupling tongue. This would materially alter the claimed invention, which requires that the female coupling tongue be flexible and that the male coupling

tongue be rigid such that it causes the female coupling tongue to depress.

Vilox also improperly imports features of unclaimed embodiments into the claim. *See EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1344 (Fed. Cir. 2014). The passages relied on by Vilox describe embodiments in which the female coupling tongue is "more resilient" than the male coupling tongue and performs the "main resilience and movement" of the system. *See* Reply at 7-8, *supra* Part III.A at 28 (citing '717 Patent, 11:48-64). Notably, those passages do not define the word "non-resilient." Claim 10 lacks any comparative language whatsoever, and clearly states the "the male coupling tongue is rigid and non-resilient." *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310 (Fed. Cir. 2005) ("Our case law requires a textual 'hook' in the claim language for a limitation of this nature to be imposed.") (*abrogated on other grounds Zoltek Corp. v. United States*, 672 F.3d 1309, 1320-21 (Fed. Cir. 2012)).

Further, Vilox's proposed construction introduces a temporal, operational limitation that does not otherwise exist in the claim, "during joining." Neither the claim nor the specification make any distinction about "when" a male coupling tongue is "rigid and non-resilient." *See* Reply at 8-9, *supra* Part III.A at 29-30. Vilox also downplays the significance of the statements concerning the purpose of the alleged invention to move the elasticity from the male coupling tongue to the female coupling tongue. *See* '717 Patent, 13:15-20; *see also* Resp., 2-3, *supra* Part III.A at 20-21. Although Vilox characterizes the problems associated with prior "elasticity slots" as unrelated to the resiliency of the male coupling part, *see* Reply at 9, *supra* Part III.A at 29, it acknowledges that they were typically incorporated in the male joint elements. Further, the prosecution history is entirely consistent with Defendants' construction. Resp., 4, *supra* Part III.A at 20 (citing Ex. C at VILOX001085) ("the present application differs in that the resiliency in the joint is such that 'the female coupling tongue is resilient,' rather than the male coupling tongue.").

The applicant's broad statement was made in reference to the alleged invention of the '717 Patent, and was not limited to, as Vilox contends, the invention recited in Claim 1. Vilox's attempts to limit the applicant's statement to apply only to Claim 1 of the patent is unsupported by the intrinsic record and should be given no weight.

**B. TERM 2: "wherein the fold-down joining system further comprises:**
**[A] a coupling release channel… or**
**[B] an inclined abutment surface on the male coupling tongue… or**
**[C] an inclined abutment surface on the locking protrusion…;**
**[D] wherein the lower recess…or**
**[E] wherein the male coupling tongue..."**

| Claim Term | Vilox's Construction | Defendants' Construction |
|---|---|---|
| "wherein the fold-down joining system further comprises:<br>[A] a coupling release channel… or<br>[B] an inclined abutment surface on the male coupling tongue… or<br>[C] an inclined abutment surface on the locking protrusion…;<br>[D] wherein the lower recess…or<br>[E] wherein the male coupling tongue..."<br><br>'717 Patent (Ex. A) at claims 1 and 20. | "wherein the fold-down joining system further comprises:<br>1. at least one of:<br>a. [A] a coupling release channel being arranged between the locking protrusion and an upper surface in the groove in the second floor panel, such that the coupling release tool is placeable in the coupling release channel for engaging the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means, or<br>b. [B] an inclined abutment surface provided on the male coupling tongue for abutment with the locking protrusion of the female coupling tongue, or<br>c. [C] an inclined abutment surface provided on the | "wherein the fold-down joining system further comprises: one of [A] a coupling release channel . . . or [B] an inclined abutment surface on the male coupling tongue . . . or [C] an inclined abutment surface on the locking protrusion . . .; plus either [D] wherein the lower recess . . . or [E] wherein the male coupling tongue . . ." |

| | | |
|---|---|---|
| | locking protrusion of the female coupling tongue for abutment against the male coupling tongue, and<br><br>2. at least one of:<br>a) [D] the lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling tongue, or<br>b) [E] the male coupling tongue has a protrusion length, measured from a bottom surface of the male coupling tongue to the upper surface of the groove in the second floor panel, of between 10% to 40% of a thickness of the second floor panel." | |

**1. Plaintiff's Opening Position**

The parties dispute whether wherein clauses connected by the word "or" in claims 1 and 20, identified as elements [A]–[C] and [D]–[E] in the chart above, should be read as mutually exclusive, despite the use of the word "comprising" in the claim. Defendants contend the claims should be read to allow only "one of" elements [A]–[C] plus "either" [D] or [E]. But the claims plainly recite that the flooring systems of claims 1 and 20 "comprise" these clauses. And the '717 specification includes exemplary embodiments that Defendants' construction would read out of the claims. Because the intrinsic evidence shows that the disputed elements of claims 1 and 20 are not mutually exclusive, Defendants' proposed construction should accordingly be rejected.

**a. Defendants' Proposed Construction Ignores the Word "Comprising," Which Signals That One Or More of**

**Elements [A]–[C] and One Or More of Elements [D] and [E] May be Present**

The use of "comprising" in the claims belies Defendants' argument. As the Federal Circuit has consistently held, "comprising" is "a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) (citing *In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981)). Each independent claim in the '717 patent uses the transition word "comprising." '717 Patent (Ex. A) at 22:39–40 (claim 1), 24:45 (claim 16), 27:41 (claim 20). Additionally, the disputed portion of claim 1 starts with "wherein the fold-down joining system further *comprises*." *Id.* at claim 1 (emphasis added). Thus, the claim covers products with one or more of elements [A]–[C] and one or more of elements [D] and [E].

The claims' use of the word "or" between elements [A]–[C] and between [D] and [E] does not change this analysis. Construing "or" is a context-specific exercise, where courts look to the claim and specification to determine whether the patentee intended the alternatives to be inclusive or exclusive. Where the claim limitations separated by "or" are not necessarily mutually exclusive, the court will interpret the claim to require any one of, or one or more of, the claim limitations. *See Teva Pharms. Int'l GMBH v. Eli Lilly & Co.*, No. 18-CV-12029-ADB, 2021 WL 723337, at *12 (D. Mass. Feb. 24, 2021) (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)). And, as further discussed below, the '717 specification shows a single system may include multiple of elements [A]–[C] and [D]–[E].

**b. Defendants' Construction Should be Rejected Because it Would Exclude Preferred Embodiments**

Defendants' attempt to add mutually exclusive language to the '717 claims should also be rejected because it would read out preferred embodiments described in the patent's specification.

A claim construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp.*, 90 F.3d at 1583.

The '717 patent specification and figures expressly disclose embodiments having each of claim elements [A]–[C]:

> [A] a coupling release channel being arranged between the locking protrusion and an upper surface in the groove in the second floor panel, such that the coupling release tool is placeable in the coupling release channel for engaging the female coupling tongue, to depress the female coupling tongue to release the horizontal locking from the locking protrusion and/or to release the vertical locking means, or
>
> [B] an inclined abutment surface provided on the male coupling tongue for abutment with the locking protrusion of the female coupling tongue, or
>
> [C] an inclined abutment surface provided on the locking protrusion of the female coupling tongue for abutment against the male coupling tongue.

*See* '717 Patent (Ex. A) at 18:36–61; Fig. 19; *see also* Ex. C at VILOX001038 (during prosecution of '717 patent, identifying embodiments having all of claim elements [A]–[C]).

Indeed, Figure 19 of the '717 patent illustrates an embodiment having all three elements:



’717 Patent (Ex. A) at Fig. 19.

This embodiment includes (A) a coupling release channel, (B) an inclined abutment surface (47) on the male coupling tongue, and (C) an inclined abutment surface (39) on the female coupling tongue. ’717 Patent (Ex. A) at 18:47–61, Fig. 19.

Figure 12 of the ’717 patent shows the coupling release channel 41—a gap formed between the male and female coupling tongues. *Id.* at Fig. 12. An ordinary artisan would appreciate the embodiment in Figure 19—while not so labelled—also has a coupling release channel 41, as shown in Figure 12. *See id.* at Fig. 19.




’717 Patent (Ex. A) at Fig. 12.

By combining elements [A]–[C] together, the embodiment in Figure 19 provides users with two ways to disassemble the flooring panels. As the ’717 specification explains, the coupling release channel corresponding to element [A] allows the user to insert a coupling release tool, then

use it to push down on the female tongue, releasing the lock between the panels. *Id*. at 15:23–49; Fig. 12. And the inclined abutment surfaces corresponding to elements [B] and [C] enable the two panels to pivot for disassembly. *See id.* at 18:47–50 ("the second panel 20 can be released from the first panel 10 by pivoting the second panel 20 around the contact between the male coupling tongue 40 and the female recess 30."), *see also id.* at 18:36–61. Thus, the joining system of Figure 19 includes features corresponding to all of claim elements [A]–[C]. This allows for disassembly of flooring panels either by using a coupling release tool or by pivoting the panel upward.

Because this embodiment includes each of claim elements [A]–[C], claim 1 should be read to require "at least one of"—not only one of—these claim elements. *See Teva Pharms*, 2021 WL 723337, at *12 (reading "or" to mean "one or both" where a preferred embodiment in the specification encompassed both claim terms that were separated by "or"). For the construction "that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The '717 specification and figures also expressly disclose embodiments that include both of elements [D]–[E]:

> [D] the lower recess extends on the underside of the female coupling tongue a distance, from a distal surface thereof to between 60% to 90% of the length of the female coupling tongue, or
>
> [E] the male coupling tongue has a protrusion length, measured from a bottom surface of the male coupling tongue to the upper surface of the groove in the second floor panel, of between 10% to 40% of a thickness of the second floor panel.

*See* ’717 Patent (Ex. A) at 9:48–51, 12:51–57; Fig. 1B. For example, Figure 1B of the ’717 patent shows an embodiment where both the male and female coupling tongues have the geometries recited in claim limitations [D] and [E]. *See id.* at 3:4–15, 9:48–51, 12:51–57, Fig. 1B.




’717 Patent (Ex. A) at Fig. 1B.

Because the ’717 patent discloses an embodiment that performs each of claim limitations [D]–[E], the court should construe claim 1 to require “at least one of” (not only one of) claim limitations [D]–[E].

The prosecution history confirms that Applicant did not replace the words “and/or” with the words “or” to require the claim terms to be mutually exclusive. The Examiner took issue with the Applicant’s use of “and/or” in the claim language, stating that 1- “[i]t does not appear that there is an embodiment that includes all three of these claim elements” and 2- “[t]he numerous “and/or” clauses muddy the scope of the independent claims.” Ex. C at VILOX000957-58. The Applicant immediately corrected this oversight, citing to Figures 17–19 and paragraphs [0140] and [0141] of the published specification as including all recited elements. Ex. C at VILOX001038 (identifying

embodiments including all claim elements in Reply to Office Action). Further, the Applicant expressly stated that the amendment of "and/or" to "or" was made solely "to advance prosecution." Ex. C at 13–14 (Applicant's Reply to Final Office Action); Ex. E at 1 (Applicant's Interview Summary). Neither the claim language nor the prosecution history suggests Applicant had any intention of making claim elements [A]–[C] or [D]–[E] mutually exclusive. Nor was Applicant amending the claims to overcome cited prior art wherein more than one of the claim limitations was present.

There being no conflict between the specification and the prosecution history, the court need not review extrinsic evidence to construe the claim term. *see Vitronics*, 90 F.3d at 1583–86.

**2. Defendants' Answering Position**

The term "or" can be construed as either inclusive or exclusive. *See DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*, No. 2:12-cv-00764-WCB-RSP, 2015 U.S. Dist. LEXIS 3629, at *10 (E.D. Tex. Jan. 13, 2015) ("It is well recognized that the word 'or' can be used in either an inclusive or an exclusive sense, depending on context."). In its inclusive sense, "or" means "A or B, or both." *Id.* In its exclusive sense, "or" means "A or B, but not both." *Id.* "[D]etermining how to interpret 'or' is a context-specific exercise that requires courts to look to how the word is used in the claim and specification." *Teva Pharms. Int'l GMBH v. Eli Lilly & Co.*, No. 18-CV-12029-ADB, 2021 WL 723337, at *12 (D. Mass. Feb. 24, 2021). The term "or" should be construed as exclusive where it is clear from the intrinsic evidence that the usage of "or" does not embrace "and." *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1331 (Fed. Cir. 2001) (upholding construction of "or" term as exclusive where "there is no basis whatsoever for believing that [patentee] intended its usage of 'or' somehow to embrace 'and'"); *see also SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1199–1200 (Fed. Cir. 2013) ("The disjunctive 'or' plainly designates that a series describes alternatives.").

Prosecution history disclaimer prevents patentees from recapturing in claim construction specific meanings that were previously disclaimed. *Omega Eng'g, Inc.*, 334 F.3d at 1323. Under this doctrine, a patentee limits the meaning of a claim term when they make a clear and unmistakable disavowal of claim scope during prosecution. *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). Both claim amendments and patentee arguments can be disavowals of claim scope. *Biogen Idec, Inc., v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Amendments made for reasons other than defining over prior art—such as § 112 rejections—may give rise to prosecution disclaimer so long as they are an unambiguous narrowing of claim scope. *See generally id*.

Even without clear disavowal, the prosecution history informs claim construction. *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction") (citation modified). For example, limitations deleted during prosecution should not be read back into the claims. *Traxxas, L.P. v. Hobbico, Inc.*, No. 216CV00768JRGRSP, 2017 WL 4347709, at *15 (E.D. Tex. Sep. 29, 2017).

Here, the term "or" should be read exclusively. First, the initial list in the term should be read as [A], [B], or [C], but not in any combination of [A], [B], and [C], because the patentee disclaimed [A], [B], *and/or* [C] during prosecution. Second, the wherein clause at the end of the term should also be read as [D] or [E], but not both, as that is consistent with plain language of the claims.

**a. Claim scope covering more than one of [A], [B], or [C] was disclaimed by the patentee.**

During prosecution, the patentee disclaimed claim scope of more than one of [A], [B], or [C] by amending "and/or" to "or" to overcome a written description rejection. Specifically, this

claim term was rejected under 35 U.S.C. § 112(a) for claiming subject matter not contained in the specification, and under § 112(b) as being indefinite for failing to particularly point out and distinctly claim the subject matter regarded as the invention. Ex. C ('717 Patent Prosecution History) at VILOX000957–58. In making this rejection, the Examiner highlighted that "it does not appear that there is an embodiment that includes all three of these claim elements" and that "the numerous 'and/or' clauses muddy the scope of the independent claims." *Id*. In response to this rejection, Vilox initiated an interview with the Examiner to inquire whether "removing 'and/or' clauses and replacing them with 'or' clauses" would overcome the 112 rejections. *Id*. at VILOX001000. The Examiner stated that it appeared this amendment would overcome the rejection. *Id.* Vilox then amended the claims, replacing each "and/or" with "or." *Id*. at VILOX001027–36. The application subsequently issued as the '717 patent. *Id.* at VILOX001167–69 (Notice of Allowance). This claim amendment specifically narrowed the claims by removing "and" and leaving just "or." As such, it disclaimed any claim scope covering more than one of [A], [B], or [C]. *See Kustom Signals, Inc.*, 264 F.3d at 1331–32 (finding prosecution history required "or" to mean one or the other, but not both, where patentee amended claims from "and" to "or"); *see also Biogen Idec, Inc.*, 713 F.3d at 1095. Or, at minimum, this claim amendment confirms Unilin's construction is proper. *See Personalized Media*, 952 F.3d at 1340 ("even where prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction") (citation modified). Any other construction would read the "and" term back into the claims and directly conflict with the written description issue the Examiner identified. *See Traxxas, L.P.*, 2017 WL 4347709, at *15 (deleted limitations should not be read back into the claims); *see also Kustom Signals, Inc.*, 264 F.3d at 1331 (upholding construction of "or" term as exclusive where "there is no basis whatsoever for believing that [patentee] intended its usage of

'or' somehow to embrace 'and'").

The remaining intrinsic evidence confirms this understanding. As the Examiner properly identified during prosecution, the specification fails to disclose an embodiment having each of claim elements [A]–[C]. Ex. C ('717 Patent Prosecution History) at VILOX000957–58. The patent describes two different embodiments with different methods of releasing one floor panel from another—using a coupling release tool and pivoting out. *Compare* '717 Patent at Figs. 1-4, 12 (coupling release tool) *with id*. at Figs 19-23 (pivoting out); *see also id*. at Claim 1 ("the fold-down joining system being configured for release by a coupling release tool or by pivoting the second floor panel in relation to the first floor panel"); Ex. C ('717 Patent Prosecution History) at VILOX001027 (amending Claim 1 to "being configured for release by a coupling release tool ~~and/~~or by pivoting the second floor panel in relation to the first floor panel"). None of these different embodiments include all three elements of the claims—as Vilox implicitly concedes. *See* Op. Br. at 18, *supra* Part III.B at 40-41. At most, the patent discloses embodiments having two of these three claimed elements (e.g., elements [B] and [C] in Figure 19). But the scope of disclaimer is determined by what a person of ordinary skill would understand the patentee to have disclaimed, not by what they *needed* to disclaim. *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1351 (Fed. Cir. 2019). Even if the claim did not need to be completely exclusive, a person of ordinary skill examining this file history and specification would read this amendment of "and/or" to "or" as a forfeiture of the multi-element scope in favor of several alternative subsets of claim coverage. Unilin's proposed construction is consistent with this intrinsic record.

Vilox's proposed construction contradicts the intrinsic record. Specifically, it reads any meaning out of the "and/or" to "or" claim amendment. Under Vilox's construction of "at least one of" [A], [B], or [C], the "or" term is read inclusively. But if "or" is read inclusively then it is no

different than "and/or" which renders the patentee's claim amendment superfluous. The amendment of "and/or" to "or" was made in response to a written description rejection based on lack of support for embodiments including all three claim elements. A person of ordinary skill reading the prosecution history would understand that amendment to have meaning—specifically, disclaimer of any "and" claim scope. *See Traxxas, L.P.*, 2017 WL 4347709, at *15 (deleted limitations should not be read back into the claims). As such, the proper construction of this term must carve out claim scope including more than one of [A], [B], or [C].

Vilox's argument that Unilin's construction would exclude preferred embodiments fails. Vilox urges that "[t]he '717 patent specification and figures *expressly* disclose embodiments having each of claim elements [A]–[C]." Op. Br. at 16, *supra* Part III.B at 39 (emphasis added). It does not. Tellingly, Vilox provides no examples of an embodiment "expressly" disclosing each of claim elements [A]–[C]. Vilox instead relies on attorney argument that "[a]n ordinary artisan would appreciate the embodiment in Figure 19—while not so labelled—also has a coupling release channel 41, as shown in Figure 12." Op. Br. at 18, *supra* Part III.B at 40. This statement is wholly without support—no declaration from an ordinary artisan or any other intrinsic or extrinsic evidence. The intrinsic evidence instead confirms the opposite; the specification fails to disclose a single embodiment having each of claim elements [A]–[C]. As discussed above, the specification discloses two different embodiments for releasing the floor panels—using a coupling release tool and pivoting out. Vilox attempts to mix and match elements from these two different embodiments to support its construction. Specifically, Figure 19, according to the specification of the granted patent, is a pivoting out embodiment. '717 Patent at 18:47-49. Figure 12 is a release tool embodiment. *Id.* at 15-25:28. The description of Figure 19 does not include any discussion of release by the release tool and the description of Figure 12 does not include any discussion of

release by pivoting out. *Id*. at 15:23-49, 18:36-67. Combining elements from these two different embodiments, as Vilox attempts to do here, is improper. *See Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021) ("A patent owner cannot show written description support by picking and choosing claim elements from different embodiments that are never linked together in the specification.").

The claims' use of "comprising" also does not affect the meaning of the "or" term here—contrary to Vilox's assertion. As discussed above, the use of "or" should be read exclusively based on the intrinsic evidence. The use of "comprising" in the claims does not negate this construction. As the Federal Circuit explained: "[t]he open-ended transition 'comprising' does not free the claim from its own limitations." *Kustom Signals, Inc.*, 264 F.3d at 1332 (rejecting argument that a comprising term meant that "or" could not be read exclusively). Vilox provides no authority to the contrary.

Finally, Vilox's argument that there was no disclaimer because of boilerplate reservations made during prosecution is contrary to the law. Vilox argues that when it amended the claims to remove "and" in response to the Examiner's written description rejection, it also stated that this was "made solely 'to advance prosecution'" and as such, it cannot be a disclaimer. Op. Br. at 20, *supra* Part III.B at 43. This is incorrect. Courts look at the substance of what actually occurred during prosecution, not any boilerplate reservations or disclaimers. *See Silvergate Pharms., Inc. v. Bionpharma Inc.*, No. CV 18-1962-LPS, 2021 WL 1751148, at *15 (D. Del. Apr. 29, 2021) (finding argument based estoppel despite prosecution statements that the patentee "'respectfully disagree[d]' with the indefiniteness rejection but made the amendments 'in order to solely advance prosecution'"), *aff'd sub nom. Azurity Pharms., Inc. v. BionPharma Inc.*, No. 2021-1926, 2022 WL 703903 (Fed. Cir. Mar. 9, 2022); *Split Pivot, Inc. v. Trek Bicycle Corp.*, 987 F. Supp. 2d 838,

874 n.18 (W.D. Wis. 2013) (finding that the statement "[w]ithout acquiescing in the rejections or the grounds therefor, and solely to expedite prosecution" did not change the Court's analysis and explaining that: "If overcoming prosecution history estoppel were as simple as including such boilerplate language with each amendment, the doctrine would be eviscerated"), *aff'd*, 585 F. App'x 1011 (Fed. Cir. 2014). Here, to obtain a patent, the patentee narrowed the scope of the claims by amending "and/or" to "or"—disclaiming claim scope of more than one claim element because such claim scope did not have written description support. A generic statement that this was done to advance prosecution should be given no weight. *See Silvergate Pharms.*, 2021 WL 1751148, at *15.

**b. The "or" term combining the remaining claim elements [D] and [E] should likewise be construed as exclusive and not inclusive.**

The claims' use of "or" in the wherein clause at the end of the claim should also be read exclusively. The claim recites "wherein [D] or wherein [E]." It does not include any comprising language. Instead, it simply presents two alternates—[D] or [E]. Reading the plain language of the claims, and construing "or" to be consistent with the rest of the claim, the proper construction here is also to read "or" as exclusive. In other words, including [D] or [E], but not both. The patentee showed that where they wished to claim one or more elements, they would specifically claim as much—i.e., through "and/or" terms. They did not do that here. These claim elements, added during prosecution, specifically recite only "or." Ex. C ('717 Patent Prosecution History) at VILOX001027–36. As with the first portion of this claim term, the "or" term in the second portion should also be construed exclusive—"either [D] or [E]."

**3. Plaintiff's Reply Position**

Defendants' proposed construction—which would permit only "one of" Elements [A]-[C] plus "either" [D] or [E]—should be rejected because it conflicts with the intrinsic record. The '717

specification and figures disclose embodiments having all the claimed structural features; the claims use the open language "comprising . . . or"; and prosecution history confirms the claims cover embodiments including more than one of elements [A]-[C] and elements [D]-[E]. For these reasons, Defendants' own authorities confirm that the Court should reject Defendants' hyper-limiting construction.

**a. Defendants' Construction Improperly Excludes Exemplary Embodiments That Practice All Disputed Claim Features**

The specification defeats Defendants' attempt to narrow the claims via its exclusive "one of" and "either or" construction: Figure 19 discloses a single joining system with Elements [A]-[C] and Figure 1B discloses a single embodiment having Elements [D] and [E].

**i. Figures 17-19 Disclose a Single Joining System with All of Elements [A]-[C]**

There is no dispute that Figure 19 depicts an embodiment having ***both*** an inclined abutment surface on the male coupling tongue (corresponding to Element [B]) ***and*** an inclined abutment surface on the locking protrusion (corresponding to Element [C]). '717 Patent at 13:6-9 (horizontal lock "may also be formed by the inclined abutment surface 38 as shown in FIG. 19"), 18:53-67 (male coupling tongue abutment surface 47 "configured to abut against the inclined abutment surface 38 on the female coupling tongue"). ***Defendants admit this***, stating "the patent discloses embodiments having ***two of these three claimed elements*** (e.g., elements [B] and [C] in Figure 19)." Resp., 14, *supra* Part IV.B.2.a, at 46. Defendants' proposed construction of "one of" [B] or [C] would exclude this preferred embodiment, a result that "is rarely, if ever, correct." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

The '717 specification confirms that Figure 19 also includes a coupling release channel corresponding to Element [A]. The specification says Figure 19 depicts a female coupling and a

male coupling "as described in relation to FIGS. 1 to 4." '717 Patent at 18:39-41. And column 11 makes clear this structure includes a coupling release channel, stating that the embodiment shown in FIGS. 1-4 . . . comprises a coupling release channel 41" arranged "between the locking protrusion 31 and an upper surface 71 in the groove 70." '717 Patent at 11:5-13. Figures 19 and 4 both illustrate the same coupling relief channel:




'717 Patent (Ex. A) Figs. 4 and 19 (Annotated).

Thus, as confirmed during prosecution of the '717 patent, Figure 19 depicts all three of elements [A]-[C], including a coupling release channel 41 (Element [A]):



’717 Patent (Ex. A) at Fig. 19 (annotated).

*See* ’717 Patent at Fig. 19; Ex. C at 13 (pointing to Figs. 17-19 and accompanying text as evidence of embodiments including all three elements). This intrinsic evidence belies Defendants’ contention that “the specification fails to disclose a single embodiment having each of claim elements [A]-[C].” Resp., 15, *supra* Part IV.B.2.a, at 47.

Because Figure 19 discloses all three of Elements [A]-[C], Vilox does not “mix and match elements from . . . different embodiments” as Defendants contend. Resp., 14-15, *supra* Part IV.B.2.a, at 46–47. *Flash-Control* is accordingly without parallel here. *Id.* at 15 (citing *Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021) (affirming district court’s grant of summary judgment of lack of written description support where the patentee was “picking and choosing claim elements from different embodiments that are never linked together in the specification”)). Worse still, *Flash-Control* is a case about written description under 35 U.S.C. § 112(a), which requires a different standard of specification support than claim construction. *Flash-Control*, 2021 WL 2944592, at *1.

#### ii. Figure 1B Discloses a Single Joining System With Both of Elements [D] and [E]

Figure 1B likewise discloses a single embodiment satisfying both Elements [D] and [E], defeating any exclusive reading of the second “or.” Figure 1B is “a side view of the joining system in which a number of measurements . . . are illustrated on the first and second panels.” ’717 Patent at 14:20-22. Figure 1B depicts both the lower recess extending a distance of “between 60% to 90% of the length . . . of the female coupling tongue” (Element [D]) (*id.* at 12:51-57) and the male coupling tongue’s protrusion length of “between 10% to 40% of a thickness” of the panel (Element [E]) (*id.* at 9:47-52). Open., 19-21, *supra* Part IV.B.1.b, at 41–43. These features are incorporated into the embodiment illustrated in Figure 19. ’717 Patent at 18:26-40, Figs. 1B and 19. Defendants

do not refute this. Resp., 16-17, *supra* Part IV.B.2.a–b, at 48–49. Because the embodiment in Figure 1B discloses both Elements [D] and [E], Defendants' construction would again exclude a preferred embodiment, a result that "is rarely, if ever, correct and would require highly persuasive evidentiary support," which is absent here. *See Vitronics Corp.*, 90 F.3d at 1583.

**b. The '717 Specification Distinguishes the Decisions Cited by Defendants**

Because the '717 specification discloses embodiments incorporating all of Elements [A]-[C] and both of Elements [D]-[E], these claim elements may be used together, meaning that "or" allows for "any one of, or one or more of," the listed elements. *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, No. 18-CV-12029-ADB, 2021 WL 723337, at *12-*13 (D. Mass. Feb. 24, 2021). The decisions cited by Defendants are distinguishable on their facts. They do not call for reading "or" and "comprising" as exclusive.

Defendants' reliance on *Kustom Signals v. Applied Concepts* is misplaced. *See* Resp., 11, *supra* Part IV.B.2, at 43 (citing *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1331 (Fed. Cir. 2001)). The patent in that case made clear the claim elements at issue, "preselected magnitude or frequency criteria," were exclusive alternatives. *Kustom Signals*, 264 F.3d at 1331. The *Kustom Signals* specification included flowcharts that "showed that ***only one*** search of memory is done for any one data set for either magnitude or frequency criteria." *Id.* And it did "not describe ***any embodiment*** that searches for and displays both modes." *Id.* But here, the '717 specification discloses embodiments including all of elements [A]-[C] and embodiments including both of elements [D] and [E]. Thus, unlike *Kustom Signals*, "or" should not be read as exclusive. Defendants' construction should be rejected because it conflicts with the '717 specification.

The claims' use of the word "comprises" confirms that Defendants' construction is wrong. Claims 1 and 20 recite a fold-down joining system that *further comprises* element [A], element

[B], or element [C]. '717 Patent at Cl. 1 ("further comprises"); Cl. 20 ("further comprising"). *Kustom Systems* addressed a transitional phrase in the claim's *preamble*, whereas the '717 claims use the open-ended word "comprises" *adjacent to* elements [A]-[C—a distinction that Defendants do not address. This distinction signals that other elements may be added and still fall within the scope of the claim. *E.g.*, *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Defendants' reading of the claim to permit only ***one of*** Elements [A]-[C] contradicts this claim language and, as explained in the Section above, conflicts with embodiments in the '717 specification.

The other cases Defendants cite do not support its construction. *DietGoal Innovations*, a decision involving statutory interpretation as to litigation costs awards, tells us that context matters. Resp., 10-11, *supra* Part IV.B.2, at 43–44 (citing *DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.*, No. 2:12-CV-00764-WCB-RSP, 2015 WL 164072, at *3 (E.D. Tex. Jan. 13, 2015)). And that, when used inclusively, "or" means "A or B, or both." *DietGoal*, 2015 WL 164072, at *3. Here, the context provided by the '717 claims and specification confirms the claims use "or" in this inclusive sense. Due to its reliance on context from the specification to construe "or" as "one or both," *Teva Pharms.* also fails to support Defendants' argument. 2021 WL 723337, at *12-*13 (relying on examples from specification for context when construing "or").

In *SkinMedica*, the Federal Circuit construed claims reciting "cells in three-dimensions"—not the term "or." *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1190-96 (Fed. Cir. 2013). The Federal Circuit made clear that courts should imply claims terms are alternatives only if there is an "implied" redefinition that is "so clear that it equates to an explicit one." *Id.* at 1196-1204. Because the *SkinMedica* specification distinguished its "three-dimensional cultures" from "bead" cultures four times, and prosecution arguments echoed this distinction, the terms were construed

to be exclusive. *Id*. But here, the ’717 specification and prosecution history show a single embodiment may include more than one claim element, confirming “or” should be read inclusively.

**c. The Prosecution History Contains No Clear and Unmistakable Disclaimer**

Defendants cannot point to any “clear and unmistakable” disavowal of claim scope that warrants reading “or” exclusively. *Omega Eng’g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324-26 (Fed. Cir. 2003). To disavow claim scope, an applicant’s statements must “be both so clear as to show reasonable clarity and deliberateness, . . . and so unmistakable as to be unambiguous evidence of disclaimer.” *Id.* at 1325. Evidence of disclaimer can include “clearly limiting statements made by the patentee to the examiner to overcome a prior art rejection,” and representations as to what the invention covers or how the prior art is different from the invention. *Id.* (collecting cases). Disavowals must be clear—statements that are “amenable to multiple reasonable interpretations,” “ambiguous,” or “inconclusive” do not restrict claim scope. *Id*. Vilox made no clear disavowal here.

During prosecution, Vilox traversed a written description rejection, pointing the Examiner to parts of the specification that disclosed Elements [A]-[C]. When rejecting the claims, the Examiner asked “[d]oes the original disclosure include an embodiment that has each of a coupling release channel and an inclined abutment surface on each of the male coupling tongue and the locking protrusion?” Ex. C at VILOX000957. In response, Vilox confirmed that the specification did indeed include exemplary embodiments having all of Elements [A]-[C] together: “At least, for example, FIGS. 17-19 and paragraphs [0140] and [0141] of the published specification disclose an embodiment that supports the claims as previously presented.” Ex. C at VILOX001038. Paragraphs [0140] and [0141] correspond to column 18, lines 36-61 of the issued patent, which

are addressed above. Vilox's statements during prosecution—correcting the Examiner's error by pointing to Figures 17-19 and accompanying text—directly align with its claim construction positions here. *See* supra section I.B.1.a, *supra* Part IV.B.3.a.i, at 39–43, 50–52.

That Vilox changed "and/or" to "or" did not clearly disavow claim scope. The Examiner made two rejections under 35 USC § 112: the first directed to the sufficiency of the written description under § 112(a) and the second directed to indefiniteness under § 112(b). In response, Vilox traversed the Examiner's unfounded § 112(a) written-description rejection. It expressly identified embodiments in the '717 specification and figures that included all of claim elements [A]-[C]. *Id.* And Vilox made clear that it "disagrees with the Examiner's contention that the claim is not supported [by the specification]." Ex. C at VILOX0001038. The "and/or" clauses were changed to "or" to address the indefiniteness rejection because the Examiner had said they "muddy" the claims' scope. Ex. C at VILOX0001039; Ex. C at VILOX000958. Contrary to Defendants' brief, Vilox did not make mere boilerplate reservations—it expressly rebutted the written-description rejection by citing embodiments that included all of elements [A]-[C]. It did not disclaim or disavow coverage of these embodiments.

The Examiner's subsequent rejections show that the Examiner understood that Vilox's amended claim used "or" to mean "one or more." Indeed, after Vilox removed "and" from the claims, the Examiner continued to cite references purportedly reading on ***more than one*** of Elements [A], [B], and [C]. Ex. G at 6-9 (non-final rejection dated Sept. 25, 2024) (contending single reference taught or suggested "a coupling release channel" (Element [A]) and "the inclined abutment surfaces" (Elements [B] and [C])). Thus, the Examiner did not limit rejections to references purportedly teaching only one of Elements [A], [B], or [C], as Defendants now ask this Court to do.

*Purdue Pharma*, relied on by Defendants, explains that not every statement during patent prosecution acts as a clear disavowal of claim scope. In *Purdue Pharma,* statements made about the efficacy of drugs having claimed parameters were not limiting where the claims were not amended to add such an efficacy limitation. *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1126 (Fed. Cir. 2006) (improper to find disavowal absent specific claim language). Here, the Applicants confirmed claim elements [A]-[C] could all be found in a single embodiment (e.g. Figure 19) and made no contrary claim amendment. Ex. C at 13. This is not clear disavowal.

*Traxxas LP* does not change this outcome. Because the *Traxxas LP* applicant had broadened its claims during prosecution by removing the words "rigidly coupled," it would have been improper to require a rigid connection, especially where the specification said the connection "may comprise" rigid soldering. *Traxxas, L.P. v. Hobbico, Inc.*, No. 216CV00768JRGRSP, 2017 WL 4347709, at *15 (E.D. Tex. Sep. 29, 2017). Vilox's claim amendments also do not mandate a narrowing construction, for Vilox left the word "or" between elements [A]-[C]. This language requires at least one of these elements, without precluding the presence of two or more. Further, as in *Traxxas LP*, the '717 specification undercuts Defendants' attempt to narrow the claims, providing examples where more than one of the claimed elements is present. '717 Patent at Fig. 19, 18:36-61; *see also* Ex. C at VILOX0001038.

*Personalized Media Communications LLC* stands for the proposition that patent prosecution history may inform the meaning of a claim phrase, particularly where the claims and specification are ambiguous. *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020). Here, the specification and prosecution history both state that a single embodiment may include one or all of elements [A]-[C].'717 Patent, Fig. 19, 18:36-61; Ex. C at 13. Because the prosecution history and specification agree, there is no reason to read "or" to mean

"only one of."

*Ajinomoto Co.*, which calls us to understanding the scope of claim changes, does not mean "or" should be exclusive here. *Ajinomoto Co. Inc. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1351 (Fed. Cir. 2019). Unlike *Ajinomoto*, which dealt with changed claim language, the word "or" remained in the '717 claims. And when removing "and/or" from its claims, Vilox confirmed that the embodiments in Figures 17-19 include all the claimed elements. Ex. C at 13.

Changing "and/or" to "or" is not narrowing, as both phrases may properly read to refer to "at least one of" Elements [A]-[C]. *See, e.g.*, *DietGoal*, 2015 WL 164072, at *3 ("or" may mean "A or B, or both"). To the extent the parties disagree about the scope of the amendment, there is no clear disavowal of claim scope. *See Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (refusing to judicially narrow a claim term where the court "simply cannot tell" what the inventors meant because disavowal demands "reasonable clarity and deliberateness").

#### d. Claim Elements [D]-[E] are not Impacted by the Amendments to Elements [A]-[C]

Mohawk has pointed to no claim amendments related to Elements [D]-[E] that would create a prosecution history disclaimer. Resp., 12, 16-17, *supra* Part IV.B.2.a–b, at 50. The sole Examiner rejection and associated Applicant amendments Mohawk points to is the "and/or" to "or" amendment between claim Elements [A]-[C]. *Id.* at 12-17, *supra* Parts IV.B.2.a–b, at 45–49. Mohawk then takes its already faulty rationale as to claim Elements [A]-[C] and applies it to Elements [D]-[E] without pointing to any similar "and/or" to "or" claim amendment. *Id.* at 12, 16-17.

**4. Defendants' Sur-Reply Position**

Vilox's position boils down to the following: the claim amendments changing "and/or" to "or"—made during prosecution in direct response to an Examiner rejection—should have no meaning. This cannot be true. Vilox made these amendments during prosecution to obtain the patent. In doing so, it gave notice to the public that the claims should be read without "and." Vilox should not be allowed to now reclaim that claim scope. Nothing in Vilox's Reply rebuts this presumption that these claim amendments have meaning. *See, e.g.*, *Traxxas, L.P. v. Hobbico, Inc.*, No. 2:16-CV-00768-JRG-RSP, 2017 WL 4347709, at *15 (E.D. Tex. Sep. 29, 2017) (deleted limitations should not be read back into the claims).

Vilox's argument that Mohawk's construction would read out a disclosed embodiment with two of three elements misses the point—Vilox itself disclaimed that embodiment when it disclaimed the undisclosed embodiment with all three elements. Specifically, Vilox argues that because the patent discloses an embodiment with two of three claimed elements, Mohawk's construction reading out that embodiment is necessarily improper. Not so. No embodiment in the patent discloses all three elements—as the Examiner properly noted. Resp., Ex. C ('717 Patent Prosecution History) at VILOX000957–58. And Vilox chose to disclaim not only this undisclosed embodiment with all three elements, but also the embodiment with elements [B] and [C]. If Vilox wanted to claim elements [B] *and* [C] it could have claimed as such—for example, by not amending that "and/or" term combining elements [B] and [C] as that "and/or" term was not the basis for the Examiner's written description rejection. Resp., Ex. C ('717 Patent Prosecution History) at VILOX000957. Instead, Vilox chose to amend all "and/or" terms to "or." Vilox's decision to disclaim a disclosed embodiment (i.e., an embodiment including elements [B] *and* [C]) when it disclaimed the undisclosed embodiments with all three elements is not a reason to now read back in an undisclosed embodiment that was surrendered during prosecution. *Ajinomoto Co.*

*v. Int'l Trade Comm'n*, 932 F.3d 1342, 1351 (Fed. Cir. 2019) (explaining the scope of disclaimer is determined by what a person of ordinary skill would understand the patentee to have disclaimed, not by what they *needed* to disclaim). Further, because the terms should be read consistently throughout the term, [D] *or* [E] should be read exclusively as well.

With the patent failing to disclose an embodiment with all claimed elements, Vilox attempts to create one in the Figure 19 embodiment. Specifically, Vilox points to an unlabeled opening between the flooring panels in Figure 19 and argues that this is a coupling release channel because it looks similar to the coupling release channel (41) labeled in other figures. Reply at 13, *supra* Part III.B at 51. This attorney speculation relies on mixing and matching elements from the two different release mechanisms described in the patent. The patent describes two separate designs for decoupling floor panels—using a coupling release tool and pivoting out. *Compare* '717 Patent, Figs. 1-4, 12 (coupling release tool) *with id*. at Figs 19-23 (pivoting out). Fig. 19, according to the specification of the granted patent, is directed to an embodiment for pivoting out—not using a release tool. '717 Patent, 18:47-49. There is no support in the specification to read a "coupling release channel" into an alternative embodiment describing a *different* release mechanism as Vilox argues. The patent describes the Fig. 19 embodiment as releasing "by pivoting" (*id.* at 18:47-52), does not have a labeled "coupling release channel 41" (*id*. at Fig. 19), and does not disclose a corresponding coupling release rod or tool, which is necessary for releasing embodiments with a coupling release channel (*see, e.g.*, *id*. at 11:5-24). Vilox does not address this intrinsic evidence contradicting its position. In fact, Vilox provides no intrinsic evidence to support its theory that the unlabeled opening in Figure 19 is a coupling release channel. Instead, it relies entirely on attorney argument that the openings in figures showing coupling release tool embodiments (e.g., Fig. 4) and figures showing pivoting out embodiments (e.g., Fig. 19) look similar. Reply at 13,

*supra* Part III.B at 51. This should be rejected in favor of the clear intrinsic record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (citation modified).

Finally, Vilox does not address that claim amendments—even if they do not rise to the level of disclaimer—still inform claim construction. *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020). Here, at minimum, the intrinsic record as a whole confirms Mohawk's construction even if, as Vilox urges, the prosecution amendment did not rise to the level of unmistakable disavowal. It is undisputed that the patent fails to explicitly disclose an embodiment that includes all three claim elements—[A], [B], and [C]. *See, e.g.*, Op. Br., 18, *supra* Part III.B at 40 (confirming no "coupling release channel" labeled in Fig. 19). It is also undisputed that the claims were amended to remove "and" in response to an Examiner rejection that the patent did not have written description support for "an embodiment that includes all three of these claim elements." Resp. Br., Ex. C ('717 Patent Prosecution History) at VILOX000957–58. Vilox's proposed construction, which reads "and" back into the claims is not only contrary to the specification, but renders its own claim amendment meaningless. For these reasons, it should be rejected.

Dated: September 4, 2026

MCCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Amy R. Harriman (#7602)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com
aharriman@mccarter.com

OF COUNSEL:

Smith R. Brittingham IV
Jeffrey Totten
Jonathan J. Fagan
Abhinav Garg
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Michael E. Kudravetz
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
Two Seaport Lane
Boston, MA 02210
(617) 646-1600

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
Stanford Research Park
3300 Hillview Avenue, 2nd Floor
Palo Alto, CA 94304-1203
(650) 849-6600

*Counsel for Vilox AB*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

OF COUNSEL:

John Haynes
John.Haynes@alston.com
Shri Abhyankar
Shri.Abhyankar@alston.com
Eric Pettis
Eric.Pettis@alston.com
Carter Babaz
Carter.Babaz@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree St. NE
Atlanta, GA 30309-3424
(404) 881-7000

*Counsel for Mohawk Industries, Inc., Mohawk Carpet Distribution, LLC, IVC US, LLC, Unilin BV, and Menard, Inc.*